STATE, EX REL. HENRY G. ATWATER, v. THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY.

1. A railroad company, chartered as a carrier of passengers and freight, is under no obligation to establish commutation rates for a particular locality, but when it has established such rates and commutation tickets are sold thereat to the public, the refusal of such a ticket to a particular individual, under the same circumstances and upon the same conditions as such tickets are sold to the rest of the public, is an unjust discrimination against him, and a violation of the principle of equality which the company is bound to observe in the conduct of its business.

2. The relator was the holder of a monthly commutation ticket. On one occasion during the month for which his ticket was issued he left it at home by inadvertence, and when on the train, being asked for his ticket and not finding it, he tendered to the conductor a regular trip ticket, provided it should not be punched and should be returned to him the next morning on presentation of his commutation ticket, and refused otherwise to pay his fare. This request the conductor refused for the reason that he had no right to permit the relator to ride on a ticket which should not be punched, and the relator remained on the train without paying fare or surrendering the trip ticket, and without any disturbance being made. *Held*—

1. That the relator by such conduct made himself liable to be ejected from the train, and it may be to the forfeiture of the commutation ticket he then held, but that such misconduct did not justify the company in refusing to sell the relator commutation tickets thereafter.

2. That for such wrongful refusal the relator may have remedy by *mandamus*.

The relator, an attorney and counselor-at-law, practicing his profession in the city of New York, resides at East Orange, in this state. He testified that he is permanently residing at that place, having resided there since August, 1884, occupying a rented house, the present lease of which expires May 1st, 1886. East Orange is on the line of the Delaware, Lackawanna and Western Railroad, the only railroad between East Orange and New York city. The regular fare between East Orange and New York city is twenty-six cents for a single ticket, and fifty cents for an excursion ticket. Monthly commutation tickets, such as the company is accustomed to sell to persons who apply for them, are sold at the rate of $6.50.

Until March, 1885, the relator was a commuter, purchasing monthly tickets at commutation rates. On the 28th of February, 1885, the relator applied to the company's agent, whose business it was to sell tickets of that class, for a commutation ticket for the ensuing month of March, and tendered the price of the ticket. The agent refused to sell relator a ticket, and assigned as his reason therefor that he had received instructions not to sell the relator commutation tickets. The relator, on the 1st of March, applied again for the ticket, and was again refused. The agent testified that in refusing to sell the ticket to the relator he acted under written instructions to him from the company's general passenger agent, of the date of February 7th, 1885, in these words: " If Henry G. Atwater, who now holds commutation No. 27, applies to you for a renewal of his ticket next month, *refuse* to sell him one. He has violated the rules governing the sale of commutation tickets, and as these are special tickets, the company has the right to refuse the privilege of buying one to any person who willfully violates the rules. If Mr. Atwater asks any questions, simply tell him that you are acting under instructions, and refer him to this office or to Supt. Reasoner."

On the day of the first refusal the relator wrote to the president of the company, stating that a commutation ticket for March had been refused, claiming the right to buy the same on the same terms as other persons, and stating that if it was again refused he would take proceedings to insure his rights and compel the issuance of the ticket. To this letter no answer was received. The agent testified that the order contained in the instructions of February 7th was never countermanded or withdrawn.

Monthly commutation tickets were sold at East Orange for the month of March, 1885, to all persons desiring to purchase, with the exception of the relator.

The relator, on the 7th of March, 1885, applied for and obtained a rule to show cause why a *mandamus* should not issue commanding the company " to cease from discriminating against Henry G. Atwater, the relator, and to furnish him

with transportation between East Orange and New York, upon the same terms upon which it furnishes the same transportation to other persons, and to issue and deliver to the said relator commutation tickets between said East Orange and New York as often and whenever he shall demand the same, upon the same terms and conditions, and for the same price upon and at which it issues and delivers them to persons in general, other than the relator."

Argued at June Term, 1885, before Justices DEPUE, VAN SYCKEL and SCUDDER.

For the relator, *Cornelius S. See.*

*Contra, J. D. Bedle.*

The opinion of the court was delivered by

DEPUE, J.   The Morris and Essex Railroad Company was incorporated in 1835, to construct a railroad for the purpose of carrying passengers and freight.   The charter authorized the company to charge for the carriage of passengers and freight, and prescribed the limits of the rates to be charged per ton for the transportation of freight, and per mile for the carriage of passengers.   *Pamph. L.*, 1835, *p.* 29, § 10.   In virtue of its charter rights and privileges the company became a common carrier of passengers and freight.   By legislative authority the Delaware, Lackawanna and Western Railroad Company, as lessee of the company's railroad, was invested with its franchises, rights and privileges, (*Pamph. L.*, 1869, *p.* 28,) subject, of course, to all the obligations and duties resting on the lessor.

At this day it would be superfluous to enter upon a discussion to support the doctrine, so well settled, that common carriers are public agents, transacting their business under an obligation to observe equality towards every member of the community, to serve all persons alike, without giving any unjust or unreasonable advantages by way of facilities for the

carriage or rates for transporting them. 1 *Wood on Railways*, § 195. The leading case on this subject is *Messenger* v. *Pennsylvania R. R. Co.*, reported as decided in the Supreme Court in 7 *Vroom* 407, and in the Court of Errors in 8 *Id*. 531. In his opinion in the Supreme Court, Chief Justice Beasley says: "It was one of the primary obligations of the common carrier to receive and carry all goods offered for transportation upon receiving a reasonable hire.   *   *   *   Thus, in the very foundation and substance of the business there was inherent a rule which excluded a preference of one consignor of goods over another.   *   *   *   Recognizing this as the settled doctrine, I do not see how it can be admissible for a common carrier to demand a different hire from various persons for an identical kind of service under identical conditions. *   *   * A person having a public duty to discharge is undoubtedly bound to exercise such office for the equal benefit of all, and therefore to permit a common carrier to charge various prices, according to the person with whom he deals, for the same services, is to forget that he owes a duty to the community." On affirmance of this case the Court of Errors was equally emphatic in affirming the doctrine that a common carrier owes an equal duty to all, which is not discharged if unequal prefer ences are made, and the enjoyment of the common right is thereby prevented or impaired.   How uniformly the doctrine of this case has been adopted and applied, will be seen by the citations and extracts from opinions of the courts of our sister states given by Mr. Justice Atherton, in his opinion in the recent case of *Scofield* v. *Lake Shore and Michigan S. R. R. Co.*, as reported in 1 *West. Rep.* 821–831.   A collection of cases illustrative of the application of the same principle to railroad, express, telegraph, gas and water companies will be found in a note to *B. & O. Tel. Co.* v. *Bell Telephone Co.*, 24 *Am. Law Reg. (N. S.)* 578.

There is also a considerable line of cases holding that the carrier may discriminate in the rates charged for the transportation of different classes of goods, or in favor of persons shipping large quantities of freight, or in favor of the long

distances for which freight is carried as against shorter distances, or upon grounds which would reduce the trouble or cost of carrying for one party as compared with another. Some of these cases were decided on the " equality clauses " in the English statutes, which our courts have held to be merely declaratory of the common law. Others were decided upon common law principles, without any statutory regulation of the subject. An examination of cases of this class will show that the common law obligation of common carriers to deal with all persons on an equality is tacitly if not expressly recognized; for such discriminations have been upheld only where, under the same circumstances and for the same class of goods, the same rates would be charged to all, or the discrimination, if made under special circumstances, appeared to be just and reasonable. *Ransome* v. *E. C. R. R. Co.*, 1 *C. B.* (*N. S.*) 437 ; 4 *Id.* 135 ; *In re Caterham Railway*, 1 *C. B.* (*N. S.*) 410 ; *In re Oxlade, Id.* 454 ; *Baxendale* v. *G. W. R. R. Co.*, 5 *C. B.* (*N. S.*) 309 ; *Same* v. *Same*, 5 *Id.* 336, 354 ; *Nicholson* v. *G. W. R. R. Co., Id.* 366 ; *Garton* v. *G. W. R. R. Co., Id.* 669 ; *Garton* v. *B. & E. R. R. Co.*, 6 *C. B.* (*N. S.*) 639 ; *Baxendale* v. *E. C. R. R. Co.*, 4 *Id.* 63 ; *Evershed* v. *L. & G. W. R. R. Co., L. R.*, 2 *Q. B. Div.* 254, 267 ; *Crouch* v. *L. & W. R. R. Co.*, 2 *C. & K.* 789, 804; 1 *Wood on Railways*, §§ 197, 198 ; 3 *Id.* 496 ; *Stewart* v. *L. V. R. R. Co.*, 9 *Vroom* 505, 520. And it is indisputable that where the carrier has a fixed schedule of rates for carriage for the public generally, a demand from one person of a higher rate for the same service would be unlawful, although the rate demanded was less than its charter allowed; for such an incorporated company has the double duty to keep within the limit of charges prescribed by its charter, and also to conform to that common law obligation to observe equality in charges with respect to all which the law of the land lays upon the business for which it was incorporated.

The principle above stated is applicable to the case in hand. In virtue of the charter under which the company transacts its business it is a common carrier of passengers as well as of

goods, and in that capacity is obliged to carry all passengers who are ready to pay for their transportation, and liable to an action at the suit of any one whom it refuses to carry without lawful excuse. *Story on Bailm.*, § 591 ; *Bennett* v. *Dutton*, 10 *N. H.* 481 ; *Jencks* v. *Coleman*, 2 *Sumn.* 221 ; *Benett* v. *P. & O. Steamboat Co.*, 6 *C. B.* 775 ; *Beekman* v. *S. & S. R. R. Co.*, 3 *Paige* 45. And, as was said by the court in the Messenger case, in virtue of its charter rights and privileges, the company is a public agent, and as such agent is placed under a duty to exercise its calling with perfect impartiality towards all persons. Carrying passengers upon commutation tickets at less rates than the charges for single tickets has become a usual mode with railroad companies in prosecuting the carrying business. It is a mode of transacting business of substantial benefit to those who are able to avail themselves of the privilege, and at the same time is greatly conducive to the growth and prosperity of parts of the state lying adjacent to the large cities. Indeed, a considerable, if not a greater part of the passenger carrying business in localities contiguous to the great business centres of the country is transacted under this system, and the rental and market value of lands in such localities is largely determined by the ability to procure transportation at reduced commutation rates. The denial of this privilege to a particular individual is to him a substantial injury. A company is under no obligation to establish commutation rates for a particular locality, but when it has established such rates, and commutation tickets are sold thereat to the public, the refusal of such a ticket to a particular individual, under the same circumstances, and upon the same conditions as such tickets are sold to the rest of the public, is an unjust discrimination against him, and a violation of the principle of equality which the company is bound to observe in the conduct of its business. There is not a perceptible shade of difference between the denial of a commutation ticket under such circumstances, and the refusal to sell the same individual an ordinary ticket at the customary rate, and demanding of him for transportation the utmost price allowed in the company's

charter in excess of the usual price at which such tickets are sold to the public, and such a denial cannot be made to square with the principles laid down and emphasized in the Messenger case.

The excuses the law admits of as sufficient to justify a common carrier in refusing to admit a passenger willing to pay his fare relate to the character or condition of the proposed passenger, or the inability of the carrier to carry such person for want of room in the vehicle. For instance, the carrier is not bound to receive gamblers, thieves, or known pickpockets, who seek to board the train to ply their vocation—persons whose conduct is riotous or disorderly, or one whose person or clothing is so filthy as to be obnoxious to other passengers, or who is afflicted with a contagious disease, or intoxicated to such an extent as to render it probable that he would be disagreeable or annoying to passengers. 2 *Wood on Railways,* § 297; *Boone on Corp.*, § 259. The carrier may also exclude a passenger who refuses to comply with the reasonable rules and regulations of the company.

In this instance the excuse for refusing to sell the relator a commutation ticket is his refusal to pay his fare on one occasion during the previous month, when by inadvertence he had left his commutation ticket at home. The facts of that transaction are these: that on the 6th of February, the relator, holding a commutation ticket for the month of February, took passage in the company's cars for New York city; that the baggage master came through the cars, collecting tickets, and asked the relator for his ticket; that the relator looked for his commutation ticket and could not find it, and thereupon offered a regular trip ticket, provided it should not be punched, and should be returned to him the next morning on presentation of his commutation ticket, and refused otherwise to pay his fare; that the same offer was made to the conductor and refused, for the reason that the latter had no right to permit the relator to ride on a ticket which should not be punched. The relator then rode to Hoboken without paying fare or surrendering the trip ticket, and no disturbance was made. The

relator's conduct was reprehensible. He knew, and should have respected the duty of the employees on the train in the enforcement of the company's rules. By his conduct he made himself liable to ejection from the train, and it may be to the forfeiture of the commutation ticket he then held. But we think that this misconduct did not justify the company in excluding the relator thereafter from a privilege in which as a member of the community he was entitled to participate, in common with others of the public. Such a measure of punitive justice has not been granted by any statute, and if inflicted by any regulation of the company—which it was not—would be an unreasonable exercise of the company's power to make rules and regulations for the government of passengers.

The relator's right to proceed by *mandamus* is disputed. It is insisted that his only remedy is by action for damages. It is undisputed that *mandamus* is an appropriate remedy for withholding a right such as the relator has in this instance, and that the court in its discretion will award the writ, if justified by the circumstances. *State* v. *R. R. Co.*, 37 *Conn.* 153; *Chicago & N. W. R. R. Co.* v. *The People*, 56 *Ill.* 365; *High Extr. Rem.*, § 322. It will be observed that the relator testified that his residence at East Orange is a permanent residence, and that the lease for the house he occupies extends until May 1st next. His business is established in the city of New York. He also testified that the agent's refusal was to sell him any more commutation tickets, and it does not appear that the terms of the agent's instructions by the letter of February 7th were communicated to him. The agent, on his examination as a witness on the 1st of May, 1885, testified that the order so given had not been countermanded or withdrawn, and it is manifest from this litigation that it is intended not to admit the relator's right until a decision upon that right shall be obtained—a circumstance which is sufficient evidence of refusal to justify the award of a *mandamus*. *Lindabury* v. *Freeholders of Ocean*, 18 *Vroom* 417. Furthermore, the relator applied for and obtained this rule to show cause on the 7th of March, and brought on the argument of

the rule at the first term of this court thereafter.    The delay in the decision of the case was due to causes for which the relator is in nowise responsible, and actions for damages, with the obligation to demand, and to tender the price of a commutation ticket from month to month, and make payment of the fares charged under protest every time, would be an inadequate and vexatious means of enforcing the relator's rights. Under the circumstances we think a peremptory *mandamus* in conformity with the terms of the rule to show cause should be granted.