130 N.J. Super. 416 (1974)
327 A.2d 448
JANE DOE ET AL., PLAINTIFFS,
v.
BRIDGETON HOSPITAL ASSOCIATION, INC. ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 7, 1974.
*418 Mr. Steven Z. Kleiner for plaintiff Dr. Edward S. Milner, Jr. (Messrs. Kleiner, Moore & Fisher, attorneys).
Mr. Isaac I. Serata for plaintiffs Jane Doe, Mary Roe and Dr. Calvin Hahn.
Ms. Nadine Taub and Mr. Rand Rosenblatt of counsel for all plaintiffs.
Mr. William P. Doherty, Jr. for defendant Bridgeton Hospital Association, Inc.
Mr. Joseph D. O'Neill for defendant Newcomb Hospital (Messrs. Shapiro, Brotman, Eisenstat & Capizola, attorneys).
Mr. Wayland A. Lucas for defendant Salem County Memorial Hospital.
Mr. John R. Heher for New Jersey Hospital Association as amicus curiae (Messrs. Smith, Stratton, Wise & Heher, attorneys; Mr. Frank J. Petrino on the brief).
HORN, A.J.S.C.
This is an action instituted by two women (their names as plaintiffs are pseudonyms) and two physicians licensed and practicing in this State. The physicians each specialize in obstetrics and gynecology. Plaintiffs, for themselves and all others similarly situate, seek a declaratory judgment that the policies of defendant hospitals in prohibiting their respective facilities to be used for the performance of first-trimester, elective abortions upon female plaintiffs violate their rights under the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the Constitution of the United States and Article 1 of the Constitution of the State of New Jersey.
The action initially included as defendants the Department of Institutions and Agencies of the State of New Jersey and certain officials in said Department, for the purpose of *419 compelling the Division of Medical Assistance, an agency thereof, to issue directives that the costs of medical services for such abortions be reimbursed by Medicaid. Following premulgation of regulations providing for Medicaid reimbursement for such procedures, a consent dismissal order was entered with respect to said Department of Institutions and Agencies and said officials.
Upon the filing of the complaint with affidavits and upon application to the court on representations that immediate and irreparable injury might occur to the female plaintiffs if the relief sought was not granted, the court directed that the Bridgeton and Newcomb Hospitals respectively permit their facilities to be used with respect to said plaintiffs for the purpose of the performance of such abortions.
Following an interlocutory appeal, the Appellate Division reversed the order of the lower court, stating in part:
We find no irreparable harm resulting to plaintiffs since there are other hospitals in the area that will perform elective abortions during the first trimester.
Ultimate issues of whether defendants-appellants must permit the performance of an elective abortion during the first trimester under the existing facts * * * are highly debatable and of great public importance and should await a full hearing and determination by the trial court.
Motions for summary judgment were denied and a full hearing was afforded to all parties.
In view of the unusual nature of this action and the importance of a full statement of the factual complex to all parties, a more detailed statement of facts is narrated than is actually necessary for the conclusions.
New Jersey's abortion law in effect since at least 1898 declares that any person who maliciously or without lawful justification and with intent to cause a miscarriage of a pregnant women participates in bringing about miscarriage is guilty of a high misdemeanor. N.J.S.A. 2A:87-1.
On January 22, 1973 the United States Supreme Court decided the companion cases of Roe v. Wade, 410 U.S. 113, *420 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).
In Roe v. Wade the Supreme Court held that the right to make the "abortion decision" was an aspect of "liberty" protected by the Due Process Clause of the Fourteenth Amendment and also, for that stage of pregnancy prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.
In Doe v. Bolton the court held that the Georgia statute, which contravened the constitutional right of a pregnant woman to abortion during the first trimester of pregnancy, was invalid and any statutory provisions unduly restrictive of such female's right were likewise invalid.
As a result of these holdings, although New Jersey's abortion statute is still viable, it must now be construed in the light of the Roe v. Wade and Doe v. Bolton decisions. State v. Haren, 124 N.J. Super. 475 (Law Div. 1973).
Each of the three defendant hospitals has adopted policies against permitting the use of its respective facilities for other than therapeutic abortions. The objective sought by this action is the vitiation of the effect of these policies and to compel the hospitals to permit their respective facilities to be used for what are now legal, nontherapeutic procedures calculated to abort pregnancies during the first trimester of pregnancy.
One of the female plaintiffs consulted plaintiff Dr. Milner at his office in Bridgeton. She was pregnant and desired a first-trimester abortion. Her history was that she was 36 years of age, married, and had had eight pregnancies resulting in four living children, two miscarriages and two children that died soon after birth. She was suffering from fibroids of the uterus. Her husband was disabled and her principal income was from welfare assistance. An attempt was made by the doctor to have her admitted to Salem County Memorial Hospital for the purpose of therapeutic abortion. However, the Therapeutic Abortion-Sterilization Board of that *421 hospital rejected the application on the ground that there did not appear to be therapeutic reasons for the abortion. The fact that the fibroids did not warrant the abortion was not controverted. The hospital administrator informed Dr. Milner that the rules of the hospital did not permit elective abortions. After making many telephone calls, Dr. Milner communicated with a physician who performed the procedure free of charge at another hospital.
The other female plaintiff also visited Dr. Milner for the purpose of securing an abortion. She was 27 years old, married, had had five pregnancies with four living children and desired the abortion because she couldn't afford another child. At the time she consulted Dr. Milner she had been pregnant for ten weeks. Dr. Milner unsuccessfully attempted to have her admitted to the Bridgeton Hospital. He was informed by the administrator of that hospital that its rules did not permit such abortions. This plaintiff was then referred to a clinic in Philadelphia but failed to keep an appointment there due to her alleged inability to obtain transportation. Another attempt was made to have a second-trimester abortion performed in a Philadelphia institution, but she was unable to pay for her care. Consequently she was ultimately delivered of the child.
Two of the defendant hospitals are situate in Cumberland County and one is situate in Salem County. Bridgeton Hospital is about 47 miles from Atlantic City, 37 miles from Camden, 135 miles from New York City, 35 miles from Philadelphia and 32 miles from Wilmington, Delaware. Newcomb Hospital is about 30 miles from Atlantic City, 31 miles from Camden, 122 miles from New York City, 39 miles from Philadelphia and 48 miles from Wilmington, Delaware. Salem County Memorial Hospital is about 64 miles from Atlantic City, 31 miles from Camden, 130 miles from New York City, 39 miles from Philadelphia and 15 miles from Wilmington, Delaware.
Although as discussed later each hospital is the only facility of its kind in its primary service area, those desiring *422 such elective abortions may secure same in a number of other institutions  either hospitals or abortion clinics  in Philadelphia, New York City and also in and about Camden, Atlantic City and Wilmington, Delaware. The Underwood Hospital in Woodbury, Gloucester County, about 27 miles from Bridgeton and less than that from Vineland and Salem, also permits such procedures, as does a private hospital in Marlton, Camden County.
Each defendant hospital was formed and is operated for nonprofit purposes. Each is dedicated by its certificate of incorporation to provide care for the sick and injured. Newcomb Hospital and Salem County Memorial Hospital received substantial funds from Federal Government sources for capital uses, under the Hill-Burton Act.[*] All three have received substantial funds from government sources for operating expenses. Each has been the beneficiary of large sums of money as the result of public support, partially resulting from public solicitation. Each enjoys federal income tax exemption, local property tax exemption and New Jersey sales tax exemption, as well as other exemptions. Each receives payments through Medicaid and Medicare.
Each hospital serves what is designated as its primary service area as well as a secondary service area. Most of those living in a primary service area will secure hospital service from the respective hospital when such services are required. Generally such hospitals also draw patients in common with other hospitals in the surrounding, secondary areas.
The hospitals are subject to regulation on the part of the State under the Health Care Facilities Planning Act of 1971, N.J.S.A. 26:2H-1 et seq. This enactment gave to the New Jersey State Department of Health central, comprehensive responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services. All public and private institutions, *423 whether state, county, municipal, incorporated or not incorporated, serving principally as facilities for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition, were made subject to the provisions thereof.
The act delegated far more restrictive controls over private institutions furnishing health care than had existed formerly, all for the purpose of advancing quality patient care in said hospitals, but at the same time "to protect against unnecessary duplication of facilities and services and to moderate operating costs." (Statement attached to Senate Bill No. 2088, introduced February 11, 1971, enacted in the aforesaid N.J.S.A. 26:2H-1 et seq.)
Under the statute a Health Care Administration Board was created in the State Department of Health. N.J.S.A. 26:2H-4. New hospital facilities may not be constructed, present facilities may not be expanded, and no new health care services may be instituted except upon application for and receipt of a certificate of need under said act. N.J.S.A. 26:2H-7. Whether or not a certificate of need is granted depends upon a finding that the action proposed for which a certificate is required "is necessary to provide required health care in the area to be served, can be economically accomplished and maintained, and will contribute to the orderly development of adequate and effective health care services." The criteria for making such determinations are: (a) the availablility of facilities or services which may serve as alternatives or substitutes; (b) the need for special equipment and services in the area; (c) the possible economies and improvement in services to be anticipated from the operation of joint, central services; (d) the adequacy of financial resources and sources of present and future revenues; (e) the availability of sufficient manpower in the several professional disciplines, and (f) such other factors as may be established by regulation. N.J.S.A. 26:2H-8.
*424 As a result, the State has assumed an introspective supervision and control of hospitals and facilities that had never before existed.
Notwithstanding the provisions of the Health Care Facilities Planning Act, the hospitals still enjoy privileges consistent with private status, which include the election of boards of directors by members of the respective hospital associations, appointment of officers and medical staffs by the respective governing bodies, and general control of operation and policy, subject only to the requirements of the act.
Vacuum aspiration is the usual and generally accepted method for producing abortion during early pregnancy, i.e., before the end of the 13th week. A suction tube is introduced into the uterus for the purpose of removing the contents thereof. From the 13th to the 16th weeks of pregnancy physicians suggest that no abortions be performed. Between the 16th and 20th weeks the method commonly used is the injection of a strong saline solution into the uterus, which generally precipitates the miscarriage.
The earlier the procedure the less risk accompanies it. Complications increase gradually from about the 7th week to the 13th week. From approximately 5% to 6%, up to the seventh week, the rate of complication will increase to approximately 12% to 13% at the end of the 13th week. Starting with the 16th week it rises to about 25%.
Clinics charge about $150 to $175, including the usual medical service, for the procedure during the first trimester. Private hospitals charge about $200 to $250 for use of the facilities, exclusive of the physician's charge. Second-trimester charges in hospitals approximate $350 and up, depending on the number of hospital days required.
Where the hospitals possess the necessary equipment and facilities, they will permit generally all types of elective procedures other than abortions.
Plaintiff physicians assert that statistics demonstrate that of those seeking first-trimester abortions approximately 75% *425 are unmarried, 60% are white, 40% are nonwhite (mostly black). Over 50% are less than 24 years of age and only about 60% request the surgical procedure before they are less than ten weeks pregnant. About 20% request abortion between the 11th and 12th weeks, and 20% after the 12th week. Of all these about 40% submit Medicaid forms.
Low-income women, it is contended, are at a decided disadvantage as the result of compulsory referral by their physicians to physicians in other areas where there are available facilities. Hardship results to them because they cannot afford the added costs of travel; loss of wages or salary, if employed; expenses for baby sitters, and the requirements of some institutions that the costs of the procedure be deposited in advance. In addition to these disadvantages, they also suggest that the delay caused by necessary referrals and preparation sometimes goes beyond the first trimester so that an elective abortion may no longer be obtainable in this State. In such cases the alternatives are either to incur greater expense to have the procedure performed in a jurisdiction such as New York City, where elective abortions may be had after the first trimester, or to be delivered of the child at full term. It is also asserted that the inability to obtain the operation is a source of increased distress and mental pain and suffering for such women. However, about one week will elapse from the time patients visit plaintiff physicians to the performance of an abortion at a facility other than one of defendant hospitals. This includes time for referral, visit and preparation.
Although recognized that if possessed of the necessary apparatus a physician could perform the first-trimester procedure at his office, this is not desirable, for safety reasons, by reason of possible complications and the absence of sufficient personnel to aid in the performance of the process.
It is estimated that when a woman is referred to another physician for the operation because of unavailability of local facilities, only 60-70% return for follow-up care, as against *426 approximately 95% who return for follow-up care to the physician who performs the procedure.
Each hospital has the facilities to perform the procedures sought by plaintiffs. These facilities would not be overtaxed if they were used for the elective procedures or, if they would be, reasonable regulations as to use could be appropriately made.
Plaintiffs' contentions embrace two principal points: first, that the decision of each hospital constitutes "state action" and therefore is in violation of the Fourteenth Amendment to the United States Constitution; second, that the hospital powers are reviewable as powers in trust, and the actions of the hospitals complained of are not consistent with the public good and should be set aside. Greisman v. Newcomb Hospital, 40 N.J. 389, 396, 404 (1963).
Before pursuing each of these contentions the appropriate perspective should be mounted. This requires comment with respect to what Roe and Doe, both supra, did not declare. They did not direct hospitals or other health facilities to permit elective abortions. They did not declare that any such health facility was required to make available its facilities for such procedures. They did not require individuals to participate in the procedures. They did not ipso facto pronounce that any hospital or health facility refusing to lend its facilities for a first-trimester abortion was in violation of the rights of a female.
The direct effect of Roe and Doe was to excise from that area of criminality under state abortion laws the procedure of a voluntary, nontherapeutic miscarriage performed within the first trimester.

I
The Fourteenth Amendment to the United States Constitution prohibits a state from making or enforcing any law which shall abridge the privileges or immunities of citizens.
The Civil Rights Act of 1871, 42 U.S.C.A. § 1983, in part reads:
*427 Every person who, under color of any statute, ordinance, * * *, custom, or usage, of any State * * *, subjects, or causes to be subjected, any citizen * * * to the deprivation of any rights * * * secured by the Constitution and laws, shall be liable * * * for redress.
In addition to the original jurisdiction given to the United States District Courts to redress the deprivation of a citizen under the Civil Rights Act of 1871 (28 U.S.C.A. § 1343), state courts also have jurisdiction. Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 301 (Ch. Div. 1970).
Unquestionably there is "state action" in the denial of such procedures by government-operated hospitals which have available facilities. Hathaway v. Worcester City Hospital, 475 F.2d 701 (1 Cir.1973); Doe v. Hale Hospital, 369 F. Supp. 970 (D. Mass. 1974); Nyberg v. City of Virginia, 495 F.2d 1342 (8 Cir.1974)  all the foregoing involving municipal or public hospitals.
But when the entity involved is private the question of whether the action is "state action" is complex and can only be answered by a review of all the circumstances. There is no precise formula and "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).
I have already recounted facts concerning the sources of hospital funding for capital and operational purposes, the tax exemptions, the position of the hospitals in the scheme of health care in their respective areas, the corporate objectives of each, as well as the magnitude of the State's regulation of all hospitals.
Plaintiffs rely heavily on Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir.1963), cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). In that case plaintiffs charge defendant hospital with race discrimination with respect to selection of its medical staff and its policy regarding admission of patients. The court held that the *428 action was "state action." It was shown that the Cone Hospital received Hill-Burton funds, tax exemptions, Medicare and Medicaid funds (as do the instant defendant hospitals), and was also the subject of intensive regulation by the state. But in addition to these facts there were two more important facts. First, five out of 15 members of the governing board were appointed by various state agencies and one by a "public agency." Second, the Hill-Burton statute prohibits the beneficiaries of its grants from engaging in any form of racial discrimination. The case therefore is vastly different by reason of these last two cited facts.
The point was raised and clearly decided against the pregnant female and her physician in Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7 Cir.1973). The principal issue was whether defendants who are regulated by the State of Wisconsin and have accepted financial support pursuant to the Hill-Burton Act may refuse to perform abortions without offending the Civil Rights Act, 42 U.S.C.A. § 1983. It held that they may so refuse.
Substantially the same arguments were pressed there as in the instant case  the danger of a clinic abortion in the female plaintiff's case; that practical considerations, such as time, distance and expense, normally limited the plaintiff doctor's practice to hospitals in the area; that defendant hospital was regulated by the state, that it has received funding under the Hill-Burton Act from the Federal Government and has been an agency through which the State of Wisconsin and the United States Government have provided medical services for residents of Northeastern Wisconsin; that every passing day increases the medical risk to the female plaintiff and that she was nearing the end of her first trimester of pregnancy, at which point medical risks increase dramatically.
The court in Bellin held that there is no constitutional objection to the decision (not to permit elective abortions) by a purely private hospital. "We think it is also clear that if a state is completely neutral on the question whether private hospitals shall perform abortions, the state may expressly authorize *429 such hospitals to answer that question for themselves." [at 760; emphasis supplied.]
As observed by the court in that case, the Supreme Court in Doe v. Bolton, supra, impliedly approved a section of the Georgia statute under review in that case when it said: "There is also a provision [subsection (e)] giving a hospital the right not to admit an abortion patient and giving any physician and any hospital employee or staff member the right, on moral or religious grounds, not to participate in the procedure." 410 U.S. at 184, 93 S.Ct. at 744.
The Bellin court rejected plaintiffs' arguments that the hospital's right to make the decision had been limited by the Hill-Burton Act and the Civil Rights Act of 1871 in the following language:
The facts that defendants have accepted financial support, as alleged, from both the federal and state governments, and that the hospital is subject to detailed regulation by the State, do not justify the conclusion that its conduct, which is unaffected by such support or such regulation, is governed by § 1983 (Civil Rights Act of 1871). [Doe v. Bellin, supra, 479 F.2d at 761]
Taylor v. St. Vincent's Hospital, 369 F. Supp. 948 (D. Mont. 1973), was an action against a hospital founded on the assertion that it violated plaintiff's rights in refusing to permit her to undergo a tubal ligation at the time of her Caesarean delivery. The parties stipulated that defendant hospital was a private corporation operating a hospital facility and as such it received certain tax benefits from the State of Montana, and also that before the present administration took over the predecessor administration operating the hospital applied for and received Hill-Burton funds.
In holding that plaintiff's action must be dismissed and that the hospital was not required to permit its facilities to be used as demanded by plaintiff, the court noted that on June 18, 1973 the President signed into law the Health Programs Extension Act of 1973. Title IV, § 401, of that act provides in part:
*430 (b) Receipt of any grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disability Services and Facilities Construction Act by individual or entity does not authorize any court or any public official or other public authority to require * * *
(2) such entity to 
(a) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions. [Public Law 93-45; 87 Stat. 91, § 401(b)]
In Greco v. Orange Memorial Hospital Corp., 374 F. Supp. 227 (E.D. Texas 1974), a doctor sought a declaratory judgment that the policy of the hospital prohibiting the performance of elective abortions was unconstitutional. The hospital was constructed through the combined efforts of the state government, the federal government and also private persons, with the goal of providing health care for the people of Orange County, Texas. Land had been donated by private donors. The original construction was paid for through the issuance of interest-bearing county bonds and through the use of Hill-Burton funds. Initial operating expenses were raised through public donations in the local area. The hospital was chartered as a nonprofit corporation and entered into a lease agreement with the county, whereby the county agreed that the hospital building and land would be leased to the corporation to operate the hospital for renewal periods of five years at $1 a year. The corporation agreed to operate the hospital at its own expense; maintain the facilities without cost to the county; pay all taxes and insurance, and assume any liability arising from litigation involving the hospital. Additionally, it agreed to accept persons certified by the county as indigents on a reimbursable basis. Because the hospital enjoyed the status of a nonprofit corporation it was exempt from federal, state and local taxes.
No county official sat on the board of directors, which was the policy-making body, and the corporation operating the hospital was a separate, independent entity from the county.
*431 The court held that the central jurisdictional question concerned the issue of whether there was sufficient state action to confer upon that court the subject matter jurisdiction. It held that there was not, on the ground that "for a private hospital to be subject to the Civil Rights Act of 1871, [42 U.S.C.A. § 1983], or the Fourteenth Amendment, its actions must be imbued with state involvement to a significant degree." [at 232; emphasis supplied]
I agree with the contention of defendants that governmental regulation of or participation in some or even most of the affairs of defendant hospitals does not make every act of defendant so imbued with governmental action that each act can be subjected to constitutional restraints. Moose Lodge v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Jackson v. Norton-Children's Hospitals, 487 F.2d 502, 503 (6 Cir.1973); Greco v. Orange Memorial Hospital Corp., supra, 374 F. Supp. at 232. To be regulable or subject to constitutional standards, the very activity of defendants which plaintiffs challenge must be supported by state action, Doe v. Bellin Memorial Hospital, supra, 479 F.2d at 761; Watkins v. Mercy Medical Center, 364 F. Supp. 799, 802 (D. Idaho 1973); Powe v. Miles, 407 F.2d 73, 81 (2 Cir.1968), that sufficiently fosters or encourages that activity. If the state is completely neutral and does not foster or provide the "impetus" for the hospital policy causing plaintiffs' alleged injuries, defendants' actions do not amount to state action. Moose Lodge v. Irvis, supra, 407 U.S. at 172, 92 S.Ct. 1965; Doe v. Bellin Memorial Hospital, supra, 479 F.2d at 760-761; Ward v. St. Anthony Hospital, 476 F.2d 671, 675 (10 Cir.1973). To hold otherwise would insinuate state action in almost every corporate action, for there is hardly any activity in this complex civilization that is not affected in some way by either federal, state, municipal or bureaucratic regulation. Absent a direct mandate from some governmental authority with respect to the adopted policy under attack, the "sifting of facts and weighing [of] circumstances" must lead one to reasonably *432 conclude that the policy is fostered by the state de jure or at least de facto. Courts should not distort the factual implications to arrive at a conclusion one way or the other. If the state is "neutral" or has not "imbued" the alleged actions with state involvement to a significant degree, a court is not authorized to conclude that state action is involved.
Plaintiffs also rely heavily on Public Utilities Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), and Jackson v. Statler Foundation, 496 F.2d 623 (2 Cir.1974). Both of these cases are clearly distinguishable.
The issue in the former was whether the installation and use of receivers and loud speakers for transmission of radio programs in public buses privately owned but regulated by the Public Utility Commission of the District of Columbia was in violation of plaintiff's constitutional rights to free speech and privacy. The court held that it was not. It upheld jurisdiction to review the action, primarily on the basis that the Public Utility Commission, an arm of government, had approved the action complained of.
Jackson v. Statler Foundation, supra, was a racial discrimination action brought against charitable foundations. The court held that it had jurisdiction by reason of the facts that foundations received governmental aid through tax immunities and were regulated to a large extent by the Federal Government, and because of purposes of the organization with respect to serving a public function.
The court observed that one of the most relevant of the substances of limitations imposed by the Federal Government with respect to such foundations was found in 26 U.S.C.A. § 4945(a)-(d) and (g). (At 632) "These sections provide that a foundation which gives grants to individuals must do so in an `objective and non-discriminatory' manner." On the basis of this directive from the Federal Government the court found that the scheme of regulation connotes government approval of the activity. As already mentioned, in the case at bar there appears to be no such involvement on *433 the part of any branch of government which connotes such approval.
In a strong dissenting opinion by Judge Friendly the majority opinion was taken to task for its "fundamental error [in] its loose characterization of the `state action' doctrine." Citing Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 176-177, 92 S.Ct. 1965, it repeated what had been said in Powe v. Miles, supra  that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. "Putting the point another way, the state action, not the private action, must be the subject of complaint." 496 F.2d 623, 638.
The dissenting opinion also stated: "The `state action' cases that have stressed the heavy presence of government regulation are those in which private institutions are carrying out state policy against the plaintiffs or in which the state is benefiting directly from the private activity." Jackson v. Statler Foundation, supra at 638.
I do not agree that the following Supreme Court cases support plaintiffs' position as urged by them. Each concerns much greater action than that exhibited on the part of the State of New Jersey.
In Burton v. Wilmington Parkway Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), a racial discrimination case, the state action was found in the facts that the state was the lessor of public property to the lessee who on that account was required to comply with the proscriptions of the Fourteenth Amendment as though they were covenants written into the lease.
In Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the racial discrimination was by a nongovernmental person who did it with knowledge of and pursuant to a state-enforced custom requiring such discrimination, and therefore the individual and the state were joint participants in the activity, so that the individual was *434 acting "under color of" that custom, in violation of 42 U.S.C.A. § 1983.
In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), another racial discrimination case, the court struck down an amendment to the California constitution which authorized racial discrimination by landlords in leasing their premises, notwithstanding earlier statutory enactments to the contrary, which were thereby impliedly repealed.
In McCabe v. Atchison, Topeka & Santa Fe R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), the court dealt with a statute which, as construed by the court, authorized carriers to provide cars for white persons but not for negroes. The court held, notwithstanding dismissal of the complaint on a procedural ground, that such a statute was invalid under the Fourteenth Amendment, because a carrier refusing equal service to negroes would be "acting in the matter under the authority of a state law." This was in fact a statute authorizing a private corporation to invade the civil rights of citizens, which right the corporation would not otherwise have. Reitman v. Mulkey, supra, 387 U.S. at p. 379, 87 S.Ct. 1627.
In Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1931), the court was faced with a statute empowering the executive committee of a political party to prescribe the qualifications of its members for voting or other participation, but containing no directions with respect to the exercise of that power.
In commenting on the holding in Nixon v. Condon, supra, the court in Reitman v. Mulkey, supra, said (387 U.S. at 379, 87 S.Ct. at 1633): "This was authority which the committee otherwise might not have had and which was used by the committee to bar Negroes from voting in primary elections." (Emphasis supplied.) Reposing this power in the executive committee was held to insinuate the state into the self-regulating, decision-making scheme of the voluntary association; the exercise of the power was viewed as an expression *435 of state authority contrary to the Fourteenth Amendment.
On January 31, 1973 the then Attorney General of the State of New Jersey said in a press release in connection with the Roe v. Wade and Doe v. Bolton opinions, both supra, announced only eight days earlier, "No hospital or clinic is compelled to permit abortions to be performed on its premises."
Plaintiffs assert that this statement constituted state encouragement to hospitals to deny the use of their facilities for elective abortions and that it along with all the other circumstances evidenced "state action." Not so.
The statement was a fair interpretation of the court's holding in Doe v. Bolton, as already alluded to herein. But, more importantly, the Attorney General's statement did not encourage or give authority which the hospitals otherwise did not have. Reitman v. Mulkey, supra.
The very fact that there are hospitals and clinics in the State which permit the procedures is to a degree mute testimony that the Attorney General's statement was not accepted as encouragement for one policy or another.
The Division of Medical Assistance and Health Services announced on November 29, 1973 that it would pay providers of medical services for all "medically indicated" abortions performed on Medicaid eligible women "without distinction between elective and therapeutic abortions performed on or after January 22, 1973." (Health Services Program Staff Bulletin A-9.2, Department of Institutions and Agencies, Division of Medical Assistance and Health Services)
Such announcement and policy is contrary to an asserted policy of encouraging hospitals not to permit their facilities to be used except for therapeutic procedures.
Accordingly, I find no "state action" and specifically that the policy of the defendant hospitals is not in violation of plaintiffs' civil or constitutional rights under the Fourteenth Amendment.

*436 II
Substantially all the factors in Greisman, supra, which led to that court's declaration that Newcomb Hospital was "in no position to claim immunity from public supervision and control because of its allegedly private nature," 40 N.J. at 396, are present in the case at bar.
As cautioned in Greisman, however, the court is not asked to pass on a discretionary exercise of judgment but only on the validity of the adopted policy (at 402). And as particularly observed in Greisman (at 403): "Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support."
Greisman overturned a policy of Newcomb Hospital which arbitrarily rejected an application for staff privileges submitted by an osteopathic physician because he had not graduated from a medical school approved by the American Medical Society and was not permitted membership in the County Medical Society. The court held that the applicant was entitled to have his application for membership evaluated on its own, individual merits.
The fact that the policy under attack here is concerned directly with patient services is not sufficient to distinguish the holding in Greisman so as to render it inapplicable. Consequently, the arguments of those espousing defendants' cause to the contrary are found to be without merit.
Having already related the facts applicable to each defendant hospital which parallel those in Greisman, and in addition the closer supervision by the State since then (the Health Care Facilities Planning Act was not in existence when Greisman was decided), it must be conceded that this court may review the policy of defendant hospitals. Consequently, the policy challenged by plaintiffs is subject to review by this court for the purpose of determining whether it is consistent with the "public good." Greisman, supra. *437 Ordinarily a court reviews judgments of public bodies to determine if they are arbitrary and patently unreasonable. Kramer v. Bd. of Adj., etc., 45 N.J. 268 (1965). However, whichever view is taken or intended by the court in Greisman, the result in this case is the same.
Having determined that "state action" is not involved so as to render the hospital policy to be in violation of fundamental rights of plaintiffs (Point I) and having concluded that this court has jurisdiction to review the policy in the light of Greisman, supra, I now turn to the issue of whether the action complained of is in fact arbitrary and unreasonable in the sense that the adopted policy is so inimical to the public good that it must be set aside.
This review must consider all aspects of the discretionary judgment of the hospitals, not merely the aspect of possible or even probable consequences to plaintiffs alone. Doe v. Bellin, supra. Further, it must presume in the first instance the validity of the policy under attack, in the light of the recognized managing discretion on the part of hospital officials, as stated in Greisman.
The subject itself is so highly sensitive that emotions on both sides of the issue run high. Even the decisions of Doe v. Wade and Roe v. Bolton have never been accepted as the final word on the moral question. Moral and religious concepts as well as attitudes toward birth control, population growth, women's rights and constitutional rights have shaped the scope of the controversy.
Justice Blackmun, in Roe v. Wade, supra, took pains to acknowledge awareness "of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires." 410 U.S. at p. 116, 93 S.Ct. at p. 708.
In Doe v. Hale Hospital, supra, the court stated:
This court regrets that it does not enjoy the freedom of accepting and rejecting described by Mr. Justice White where he said, at p. *438 222, 93 S.Ct. at p. 763: "* * * I cannot accept the Court's exercise of its clear power of choice by interposing a constitutional barrier to state efforts to protect human life and by investing mothers and doctors with the constitutionally protected right to exterminate it." [369 F. Supp. at 975]
And in Doe v. Wohlgemuth, 376 F. Supp. 173, 179 (W.D. Pa. 1974), in deciding that the State of Pennsylvania could not lawfully deny reimbursement to welfare recipients for costs of abortions under its medical assistance program, the court felt impelled to say: "It must be noted that in dealing with the issues in this case we are precluded from the treatment of abortion on moral grounds * * *."
In Nyberg v. City of Virginia, supra, it was said in the dissenting opinion:
Doe and Roe are primarily concerned with protecting the right of a pregnant woman to have an abortion. If that right can be reasonably protected without compelling every public clinic and hospital in the United States to perform the procedure, consideration should be given to doing so. * * * We believe that a decent regard for the deep-seated convictions of those in the community who favor abortions, as well as those who oppose abortions, can be recognized by determining whether the rights of pregnant women desiring abortions can be reasonably protected without requiring the municipal hospital to perform abortions against its will. [495 F.2d at 1348]
Each of the defendant hospitals considered and debated the problem before taking the final action complained of in the instant case. Each of the hospitals asserts that since their respective board members represent all sections, races, creeds and income levels of the citizens of their respective communities, and each having "sounded out" other members of the community in their respective service areas, they concluded that for themselves as well as for the members of the community their consciences are opposed to the use of their facilities for purposes of elective abortions, notwithstanding that in some instances the medical staffs differed in their recommendations.
Before final action was taken there were emotional demonstrations by members of the public. There were letters opposing *439 the policy as well as favoring the policy. Pickets were stationed outside the hospital entrances for one side or the other. As stated, the consensus of the respective governing boards was that a majority of citizens in each of the communities favored the respective policy decisions.
An action is arbitrary when it is without fair, solid and substantial cause  that is, without cause based upon the law or where it is nonrational. Black's Law Dictionary (rev. 4 ed. 1968), 134.
"Conscience" has been defined as the sense or consciousness of the moral goodness or blameworthiness of one's own conduct, intentions or character together with a feeling of obligation to do right or be good. Webster's 3rd New International Dictionary (1971).
As mentioned above, following Roe v. Wade and Doe v. Bolton, it was provided in the Health Programs Extension Act of 1973 that receipt of grants, loans or loan guarantees under stated federal laws does not authorize any court, public official or public authority to require such beneficary to make its facilities available for the performance of any sterilization procedure or abortion "if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions."
The "Manual of Standards for Hospital Facilities" (New Jersey Department of Health publication) contains a caveat which declares:
B. The Department of Health does not have the power or authority to:
1. Require any hospital to practice or permit sterilization of human beings, euthanasia, birth control or any other similar practice contrary to the dogmatic or moral beliefs of any well-established religious body or denominations. [Regulation 106B.1]
Conscience must be equated with "religious beliefs" or "moral beliefs." Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), and Gillette v. United *440 States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), cases involving conscientious objectors to military service.
On October 2, 1974 the Governor approved Senate No. 503, now chapter 111, Laws of 1974, which in part provides that no hospital shall be required to provide abortion or sterilization services or procedures. I do not consider this statute as "state action," for the same reasons already discussed with respect to the statement of the Attorney General. For the reasons appearing hereinafter, I need not decide and I refrain from deciding the effect of this statute. Counsel have notified me that no further argument or proceedings are requested or planned in the action.
As already mentioned, Doe v. Bolton, supra, impliedly indicated that a hospital would have the right to self-determination as to whether or not to permit the procedure.
I need not determine either the binding effect of the so-called "conscience clause" of the Health Programs Extension Act of 1973, supra, upon the court, or even the official effect, if any, of the New Jersey Department of Health announcement.
The action of Congress and the New Jersey Legislature emphasizes the importance of the issue to the citizenry. Furthermore, the disparity of views points up the fact that the hospital decisions were not purely arbitrary and based on insubstantial grounds.
It is well known that hospitals must enjoy the good will of their communities to be able to furnish the maximum service within their abilities. Hospitals depend on gifts, solicited and unsolicited, and generally the primary givers are those who reside in the service area. To require a hospital to act contrary to the community conscience as well as the conscience of its management would be itself contrary to the public good.
I do not find that there is such a shortage of available facilities within reasonable distances of the respective hospitals that, with almost minimal additional hardship, would serve to provide the service required by the female plaintiffs or *441 those similarly situate. I am not satisfied that the few hardships that may result are sufficient to overcome the reasonableness of the hospitals' determination. Nor have the physician plaintiffs demonstrated sufficient personal loss or hardship, or such injury to their patients, as to overcome the reasonableness of the hospitals' policy.
Judge Friendly said in his dissent in Jackson v. Statler Foundation, supra, 496 F.2d at 640, that if the courts take over the supervision of foundations there will ultimately be no foundations. This could equally apply to hospitals and other eleemosynary institutions.
Finally, as was said in Wahba v. New York University, 492 F.2d 96, 102 (2 Cir.1974), courts should pay heed to the "value of preserving a private sector free from the constitutional requirements applicable to government institutions." Also: "An organization should not have to demonstrate an `associational or other constitutional' claim to privacy * * * before the courts will take cognizance of the social values that private eleemosynary institutions can promote." Jackson v. Statler Foundation, supra, 496 F.2d at 639.
I have considered all the other points advanced by plaintiffs but I do not find them persuasive.
Having determined that the defendant hospitals' policy challenged in this action was neither arbitrary nor contrary to the public good in the totality of the circumstances, judgment dismissing the complaint of plaintiffs will be entered, without costs, upon presentation of a draft of such judgment pursuant to the rules.
NOTES
[*] 42 U.S.C.A. 291 authorizes grants for capital improvements for hospitals.