JANE DOE AND MARY ROE, INDIVIDUALLY AND ON BE-
HALF OF ALL OTHER WOMEN SIMILARLY SITUATED,
AND DR. EDWARD S. MILNER, JR., AND DR. CALVIN
HAHN, INDIVIDUALLY AND ON BEHALF OF ALL
OTHER PHYSICIANS SIMILARLY SITUATED, PLAIN-
TIFFS-APPELLANTS, v. BRIDGETON HOSPITAL ASSO-
CIATION, INC., NEWCOMB HOSPITAL, AND SALEM
COUNTY MEMORIAL HOSPITAL, DEFENDANTS-RE-
SPONDENTS.

Argued May 10, 1976—Decided November 17, 1976.

480

*Ms. Nadine Taub* argued the cause for appellants (*Ms. Taub* and *Mr. Steven Kleiner,* attorneys; *Mr. Rand Rosenblatt,* a member of the Pennsylvania bar, of counsel).

*Ms. Phyllis Gelman* argued the cause for *amicus curiae* New Jersey State Office of Legal Services (*Mr. Warren E. Smith,* Director, attorney; *Ms. Gelman* and *Ms. Phyllis G. Warren* on the brief).

*Mr. William P. Doherty, Jr.* argued the cause for respondent Bridgeton Hospital Association, Inc.

*Mr. Wayland Lucas* argued the cause for respondent Salem County Memorial Hospital.

*Mr. Joseph D. O'Neill* argued the cause for respondent Newcomb Hospital (*Messrs. Shapiro, Eisenstat, Capizola, O'Neill, Lisitski & Gabage,* attorneys; *Mr. Frank J. Petrino, Mr. O'Neill* and *Mr. Doherty* on the joint brief).

*Mr. John R. Heher* argued the cause for *amicus curiae* New Jersey Hospital Association (*Messrs. Smith, Stratton, Wise & Heher,* attorneys; *Mr. Heher* of counsel; *Mr. Frank J. Petrino* on the brief).

*Messrs. Lieb, Wolff & Samson* submitted a brief on behalf of *amicus curiae* Religious Coalition for Abortion Rights (*Ms. Ellen B. Kulka* and *Ms. Samantha Shad,* a member of the New York and District of Columbia bars, of counsel and on the brief).

The opinion of the Court was delivered by

SCHREIBER, J. The plaintiffs, Jane Doe, Mary Roe and their doctors, Dr. Edward S. Milner, Jr. and Dr. Calvin Hahn, instituted an action to compel the Bridgeton Hospital Association (Bridgeton), the Newcomb Hospital (Newcomb) and the Salem County Memorial Hospital (Salem)

to make their facilities available to the plaintiffs and their physicians, members of the hospital staffs, for elective abortion procedures during the first trimester of pregnancy.[1] Upon the conclusion of the trial, the court dismissed the complaint. 130 *N. J. Super.* 416 (Law Div. 1974). The plaintiffs appealed. While the matter was pending unheard in the Appellate Division, this Court, *sua sponte,* certified the cause. 69 *N. J.* 85 (1975). *R.* 2:12–1.

The plaintiffs proceeded on constitutional and non-constitutional grounds. Constitutionally, the plaintiffs alleged violations of their rights under the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and under Article I of the New Jersey Constitution. They asserted that, because of the federal, state, county and municipal financial aid received by the hospitals, their refusals to permit elective abortions constituted state action. The non-constitutional rationale was that the hospitals, as quasi-public institutions, owed an obligation to the public, including the plaintiffs, to make their facilities available; that the defendants had violated that duty by establishing arbitrary and unreasonable rules prohibiting elective abortions; that these rules were reviewable by the Court, and should be declared null and void.

The defendants contended that they were private nonprofit hospitals governed by their respective boards of trustees and that they had the absolute right to determine who should use their facilities and whether elective abortions should be permitted.

---

[1] The complaint alleges that the plaintiffs were suing on behalf of themselves and all others similarly situated. Because there was no compliance with the requirements of a class action, *R.* 4:32–1 *et seq.,* we decline to consider this case as such.

Although before trial one female plaintiff had obtained an abortion and the other had delivered a child, the public interest warrants a resolution of the cause. *John F. Kennedy Memorial Hospital v. Heston,* 58 *N. J.* 576 (1971). *See Roe v. Wade,* 410 *U. S.* 113, 125, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147, 161 (1973).

For the purposes of this opinion, a summary of the facts set forth by the trial court suffices.

Bridgeton is located in the City of Bridgeton, Cumberland County; Newcomb, in the City of Vineland, Cumberland County; and Salem, in the City of Salem, Salem County. Each is the only general hospital open to the public situated in its respective municipality, that being each hospital's primary service area. Elective abortions are permitted in hospitals or clinics located in Philadelphia, New York City, Wilmington, Atlantic City and Camden. Bridgeton is about 47 miles from Atlantic City, 37 from Camden, 35 from Philadelphia, 32 from Wilmington and 135 from New York City. Newcomb is 30 miles from Atlantic City, 31 from Camden, 122 from New York City, 48 from Wilmington, and 35 from Philadelphia. Salem is 64 miles from Atlantic City, 31 from Camden, 130 from New York City, 15 from Wilmington and 39 from Philadelphia.

All three hospitals have been incorporated as non-profit non-sectarian institutions for the purpose of making available to the public medical facilities where divers types of medical services may be performed. Each is governed by a board of trustees or directors who are elected by contributors to the hospitals. (Salem's and Newcomb's annual dues were $5 per annum and Bridgeton's were $15 per annum.) The respective boards in each institution are empowered to determine and decide policy matters. When these policies involve medical questions, the boards usually follow the recommendation of the medical staffs. Each of the boards had adopted a policy of permitting only therapeutic abortions. After the United States Supreme Court decisions in *Roe v. Wade*, 410 *U. S.* 113, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147 (1973), reh. den., 410 *U. S.* 959, 93 *S. Ct.* 1409, 1410, 35 *L. Ed.* 2d 694 (1973), and *Doe v. Bolton,* 410 *U. S.* 179, 93 *S. Ct.* 739, 35 *L. Ed.* 2d 201 (1973), reh. den., 410 *U. S.* 959, 93 *S. Ct.* 1409, 1410, 35 *L. Ed.* 2d 694 (1973), each board reconsidered its previous policy. Although the medical staffs at Bridgeton and Salem favored a change, the three boards

reaffirmed their previous policies prohibiting elective abortions.

The two female plaintiffs consulted the plaintiff Dr. Milner during the first trimester of their pregnancies. They desired abortions and Dr. Milner, who had staff privileges at both the Bridgeton and Salem hospitals, agreed to perform the operations. He attempted to make arrangements for the plaintiff Mary Roe, who lived in Salem, at the Salem hospital, but was denied use of the facilities. Dr. Milner attempted to arrange for Jane Doe's admission to the Bridgeton hospital, since she resided in Bridgeton, but that hospital also refused. Dr. Milner then referred her to the plaintiff Dr. Hahn, who was a member of the Newcomb hospital staff, but he was not permitted to use its facilities for an elective abortion.

The abortion procedure during the first trimester is relatively simple. A vacuum aspirator which operates on a suction principle is inserted into the uterus to remove its contents. It is possible to perform abortions in the doctor's office but since an anesthetic must be given, it is considered advisable to perform them at the hospital where the women are treated as outpatients.

The operating and recovery rooms are needed for approximately 30 minutes, of which only 10 minutes are devoted to the procedure itself. Thereafter the patient remains in the recovery room for approximately three hours until the anesthesia has worn off. Thus a woman may readily enter and leave the hospital on the same day. Therapeutic abortions are more serious medically than elective abortions during the first trimester and these patients usually are not treated as outpatients.

The record is clear that the Bridgeton, Newcomb and Salem hospitals have all the medical facilities necessary to perform elective abortions. Their operating rooms are also available during some periods when they could be used for this purpose. The parties stipulated that there were doctors on the staffs of each of the hospitals who were willing and

qualified to perform elective abortions and that the occupancy rate in 1971 of obstetrical beds in Bridgeton was 61%, in Newcomb, 58%, and in Salem, 37%.

The trial court reasoned that the constitutional grounds urged by the plaintiffs were invalid because no state action was involved. It rejected the defendants' contention that the principle of *Greisman v. Newcomb Hospital*, 40 *N. J.* 389 (1963), was limited to hospital policies excluding physicians from practicing at a hospital and held that "[t]he fact that the policy under attack here is concerned directly with patient services is not sufficient to distinguish the holding in *Greisman* so as to render it inapplicable." [130 *N. J. Super.* at 436]. It then turned to the issue of whether the action complained of was "arbitrary and unreasonable in the sense that the adopted policy is so inimical to the public good that it must be set aside." [*Id.* at 437]. Finding that moral and religious beliefs could reasonably justify the adoption of the regulations, it concluded that there was just cause for their promulgation.

It is necessary to return to the *Greisman* case for a full comprehension of its principle. Dr. Greisman, holder of a degree of doctor of osteopathy, who held a license to practice medicine and surgery, applied for membership on the Newcomb hospital staff. Membership was denied because of a by-law requirement that applicants be graduates of a medical school approved by the American Medical Association. The Court held that the by-law provision was arbitrary and unreasonable and that the hospital, although a non-profit private corporation, was under a duty to consider Dr. Greisman's application because of its public status. Although at common law most businesses had no public obligations, *Garifine v. Monmouth Park Jockey Club*, 29 *N. J.* 47, 50–51 (1959), Justice Jacobs noted for the Court in *Greisman* that some private businesses had been subject to judicial regulation for the common good. These institutions were quasi-public and, as such, those entrusted with their operation acted as trustees for the public. The principle was enunciated by Holt, C. J.,

in *Lane v. Cotton,* 12 *Mod.* 472, 484, 88 *Eng. Rep.* 1458, 1464–1465 (K.B. 1701):

\* \* \* [W]here-ever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him; \* \* \*. If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which is for the public good, and has thereby exposed and vested an interest of himself in all the King's subjects that will employ him in the way of his trade. If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier; \* \* \*.

Although *Greisman, supra,* dealt with the right of a doctor to apply for admission to the hospital staff and involved the somewhat monopolistic control over the rights of a doctor to practice medicine at a given location, the underlying principle rests, as the trial court in this case observed, on a much broader doctrine, the obligation of a quasi-public entity to serve the public.[2] In *Greisman, supra,* Justice Jacobs recognized that a patient in the Vineland area had a protectable interest in being served at the Newcomb hospital. He rejected the argument "that there are other hospitals outside the metropolitan Vineland area, for they may be too distant or unsuitable to his needs and desires." *Greisman v. Newcomb Hospital, supra,* 40 *N. J.* at 402. The hospital trustees' managerial powers were deeply imbedded in public aspects and, as fiduciary powers, had to be exercised reasonably and for the public good.

---

2Initially hospitals were designed to serve as a place for the custodial care of the dying poor. Hamilton, *The Voluntary Hospital in America — Its Role, Economics, and Internal Structure, in Medical Care: Readings in the Sociology of Medical Institutions* 394 (Scott & Volkart eds. 1966). Curing the ill did not become a prime hospital purpose until the latter part of the 19th century. M. *Risley, House of Healing: The Story of the Hospital* 16 (1961); 12 *Collier's Encyclopedia* 292 (1972).

■ The Bridgeton, Salem and Newcomb hospitals are non-profit corporations organized to serve the public by operating medical facilities. Each receives substantial financial support from federal and local governments and the public. Each is the beneficiary of tax exemptions. Each is an institution whose medical facilities are available to the public, particularly those who live in their primary service areas. The properties of these hospitals are devoted to a use in which the public has an interest and are subject to control for the common good. *See also De Portibus Maris,* 1 *Hargrave Law Tracts* 77–78 (1787). As quasi-public institutions, their actions must not contravene the public interest. They must serve the public without discrimination. Their boards of directors or trustees are managing quasi-public trusts and each has a fiduciary relationship with the public. Like other businesses affected with a public interest, hospitals have been subjected to legislative control. The Health Care Facilities Planning Act, *N. J. S. A.* 26:2H–1 *et seq.,* has declared the State's public policy to be that hospital services "of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." *N. J. S. A.* 26: 2H–1. The act provides that no hospital may be constructed or enlarged until a certificate of need is issued by the State Commissioner of Health, *N. J. S. A.* 26:2H–7, 8 and 9, who is empowered to conduct periodic inspections "with respect to the fitness and adequacy of the premises, equipment, personnel * * *." *N. J. S. A.* 26:2H–5. The Commissioner has adopted regulations to effectuate the purposes of the act. *N. J. A. C.* 8:33–1.1 *et seq.* Recognition by the Legislature of the special status of the hospital is consonant with its public nature and responsibilities. Judicial review and legislative control are predicated on recognition of the quasi-public status of the hospital and its obligation to serve the public.

■ ■ Proprietors of privately owned quasi-public businesses may operate within a wide discretionary range, sub-

ject to limitations called for by the commonweal. The nature, scope, and limitations of the innkeeper's discretion are illustrative. He was bound by common law to receive and lodge all comers in the absence of a reasonable ground of refusal. 21 *Halsbury's Laws of England* 445–446 (3d ed. 1957). A valid refusal had to be related to the inn's operations as an inn. *White's Case,* 2 *Dyer* 158b, 73 *Eng. Rep.* 343 (K.B. 1558). Full occupancy or the traveler's condition, such as drunkenness, which might affect other guests constituted good cause for exclusion. On the other hand, arrival at a later hour or on a Sunday was held to be insufficient to deny lodging. *Rex v. Ivens,* 7 *Car. & P.* 213, 173 *Eng. Rep.* 94 (K.B. 1835). There had to be a rational relationship, a causal nexus, between the reason for the refusal and the function of the inn. Similarly, common carriers were required to have a reasonable ground, such as lack of space, for refusing service. "For instance, the carrier is not bound to receive gamblers, thieves, or known pickpockets, who seek to board the train to ply their vocation — persons whose conduct is riotous or disorderly, or one whose person or clothing is so filthy as to be obnoxious to other passengers, or who is afflicted with a contagious disease, or intoxicated to such an extent as to render it probable that he would be disagreeable or annoying to passengers." *Atwater v. Del., Lack. & W. R. R. Co.,* 48 *N. J. L.* 55, 61 (Sup. Ct. 1886).

Justice Jacobs' concluding paragraph in *Greisman* is worthy of reiteration:

Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of

judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good. [40 *N. J.* at 403–404].

When the practice or regulation enhances standards of medical care or public welfare, broad judicial support is warranted.

■■ The hospital rule or regulation should be related to the hospital's purposes and operational needs. *Davis v. Morristown Memorial Hospital,* 106 *N. J. Super.* 33, 43 (Ch. Div. 1969). Moral concepts cannot be the basis of a nonsectarian non-profit eleemosynary hospital's regulations where that hospital is holding out the use of its facilities to the general public. The board of trustees or directors, although vested with managerial discretion within the framework of the hospital's functions and purposes, may not promulgate unrelated policies. When it does so, its determinations are unsupportable and arbitrary. *Guerrero v. Burlington County Memorial Hospital,* 70 *N. J.* 344, 356–357 (1976).

■ Neither the trial court nor the defendants have suggested that the regulations prohibiting elective abortions were adopted to further any medical standards. Medically there is no valid distinction which justifies permission to utilize hospital facilities and equipment for therapeutic, but not elective abortions. The three hospitals, Newcomb, Bridgeton and Salem, have the equipment, the facilities, and the operative and emergency room capacity for both.

The defendants contend that the rules reflect the community's conscience and that to overrule that sentiment would cause the loss of substantial financial support. The contention rests on two assumptions — that a majority of the residents in the communities served by the three non-sectarian hospitals are opposed to permitting the facilities to be used for first trimester abortions and that these contrary-minded members of the citizenry will eliminate or reduce

their financial support for the hospitals. The record does not establish the first premise. Even though the propriety of elective abortions provokes highly emotional responses, it is extremely doubtful that the public will not assist the hospitals whose services are so vital for the public health and welfare in the community. Furthermore the defendants' contention conflicts with and ignores the underlying principle of a non-sectarian hospital, whose basic purpose is to make available hospital facilities for the care and treatment of the public.

This is not to say that religious beliefs may or may not be appropriate grounds for a hospital operated by a recognized religious body to prohibit elective abortions. We are not passing upon the issues which may be considered in that context, particularly since the questions are not before us and have not been fully briefed and argued by the parties.

While this cause was pending on appeal, an act commonly referred to as the conscience law, relating to abortions and sterilization, was enacted. *N. J. S. A.* 2A :65A–1 *et seq.* That law provides that no hospital shall be required to provide abortion services or procedures, and the refusal to perform, assist in the performance or provide abortion services shall not constitute grounds for civil or criminal liability, disciplinary action or discriminatory treatment. All parties have requested that we consider the viability of this statute and we do so, in the limited context of this case. To interpret this act to empower a non-sectarian non-profit hospital to refuse to permit its facilities to be used for elective abortions would clearly constitute state action. *Reitman v. Mulkey,* 387 *U. S.* 369, 87 *S. Ct.* 1627, 18 *L. Ed.* 2d 830 (1967). *Cf. King v. So. Jersey Nat. Bank,* 66 *N. J.* 161 (1974). The federal constitutional right to an abortion during the first trimester is now well-settled. *Roe v. Wade, supra.* For the state to frustrate that right by its action would be violative of the constitutional guarantee. *Nyberg v. City of Virginia,* 495 *F.* 2d 1342 (8th Cir.), appeal dismissed, 419 *U. S.* 891, 95 *S. Ct.* 169, 42 *L. Ed.* 2d 136

(1974); *Doe v. Hale Hospital,* 500 *F.* 2d 144 (1st Cir. 1974), *cert.* den. 420 *U. S.* 907, 95 *S. Ct.* 825, 42 *L. Ed.* 2d 837 (1975). *Cf. State v Norflett,* 67 *N. J.* 268 (1975). Accordingly, we do not construe the statute to be applicable to non-sectarian non-profit hospitals.

The judgment of the trial court is reversed and the matter remanded for the entry of an order in accordance with this opinion.

SULLIVAN, J. (dissenting). Defendants are private, non-profit hospitals serving their respective communities on a voluntary basis. They have adopted a policy, based on social and moral considerations, of not permitting their facilities to be used for elective abortions. I do not view that policy as an infringement on the constitutional rights of the female plaintiffs or their physicians under *Roe v. Wade,* 410 *U. S.* 113, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147 (1973) and *Doe v. Bolton,* 410 *U. S.* 179, 93 *S. Ct.* 739, 35 *L. Ed.* 2d 201 (1973), particularly when elective abortion facilities were available within reasonable distances. Nor do I think that this Court's decision in *Greisman v. Newcomb Hospital,* 40 *N. J.* 389 (1963) mandates that such policy be held to be arbitrary and unreasonable and inimical to the public good. In the context of this litigation I would not require a sectarian or a private non-profit hospital to act contrary to its conscience. None of the cases cited in the majority so holds. I would affirm.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER and Judge KOLOVSKY—6.

*For affirmance*—Justice SULLIVAN—1.