121 N.J. Super. 1 (1972)
295 A.2d 402
JOHN MESSENGER, ON BEHALF OF HIMSELF AND ALL PERSONS SIMILARLY SITUATED, PLAINTIFF,
v.
SANDY MOTORS, INC., A DOMESTIC CORPORATION, PEOPLES TRUST OF NEW JERSEY a/k/a PEOPLES TRUST CO. OF BERGEN COUNTY, AND THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided September 29, 1972.
*2 Mr. Saul M. Ferster for plaintiff Messenger (Union County Legal Services Corporation).
*3 Mr. Robert S. Fisher for defendants Sandy Motors, Inc. and Peoples Trust of New Jersey (Messrs. Winne & Banta, attorneys; Robert S. Fisher, of counsel).
HERBERT, J.S.C.
Plaintiff charges that section 9-503 of the Uniform Commercial Code (N.J.S.A. 12A:9-503) is unconstitutional. The section reads in part as follows:
Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. * * *
On July 10, 1970 plaintiff bought a used automobile from defendant Sandy Motors, Inc. The price was $1,674.75. The cash paid was $674.75, and plaintiff agreed to pay the balance, plus interest and insurance charges, in 24 equal monthly installments of $52.01 each. The details of the transaction were set out in a written agreement signed by plaintiff, by defendant Sandy Motors and by plaintiff's wife as co-obligor. A printed form furnished by defendant Peoples Trust Company of New Jersey was used, and immediately following the transaction between plaintiff and Sandy Motors, Inc. the latter assigned all of its rights to the Trust Company.
The agreement of July 10, 1970 provided that
Seller retains a purchase money Security Interest in the Vehicle and all accessions until Buyer fully performs hereunder.
On the reverse side of the one-sheet document a number of contract terms are to be found, including the following:
In the event of default by Buyer hereunder, (1) the entire unpaid balance of the Total of Payments shall, at the option of Holder, become immediately due and payable, and (2) Buyer, upon demand, shall deliver the vehicle to Holder, or Holder may, with or without legal process and with or without previous notice or demand for performance, enter any premises wherein the vehicle may be and take possession of the same, together with anything in the vehicle. *4 Though easily readable, this quotation as well as the entire reverse side of the agreement is in fine print. On the other side, where the signatures appear, there is a reference in relatively large capital letters to the terms printed on the back of the document.
When plaintiff's payment for October, 1971 fell due it was not made on time. Prior to October 1971 plaintiff had been more than ten days late with 12 payments out of a total of 14, and for two short intervals he had been in arrears for two payments at once. This history of the account bears upon the reasons of defendant bank for the action it took when the October 1971 payment was not received, and it shows considerable tolerance in the treatment of defaults.
By November 9, 1971 the bank had not received plaintiff's payment for October and had no word from him about that payment. It decided to demand possession of the car, was unable to reach plaintiff by telephone, and sent by ordinary mail to plaintiff at his residence a written demand which he says was not received by him. Having received no payment from plaintiff and having heard nothing from him by way of explanation of his delay, the bank instructed an agency to repossess the car. On November 17, 1971 the car was taken from a parking area behind the building in which plaintiff had his apartment. Repossession took place without judicial process and without any breach of the peace. In fact, the car was taken away from the parking place without any physical confrontation with anyone. Plaintiff first learned about what had happened from the Linden police, who had been notified immediately by the agent who acted for the bank.
On November 17, 1971, the date of repossession, the bank received through the mail from plaintiff the payment for October. At the time of the repossession the bank's collection department was not yet aware that payment had arrived. The payment due on November 13, 1971 was not *5 made at the same time and was delinquent by four days when the repossession took place.
Having taken possession of the car, defendant Trust Company proposed to sell it (N.J.S.A. 12A:9-504) and so notified plaintiff. He then brought this action. Among other things, he sought an interlocutory injunction against the sale. An order to show cause containing a preliminary restraint was issued. That was followed by a negotiated arrangement between the parties by which plaintiff got the car back and the account was reinstated. In relation to the negotiations an order was entered on December 3, 1971, consented to by the attorneys and by plaintiff personally, which provided in part that claims for nominal damages on certain counts of the complaint would survive. Plaintiff now urges that section 503 of the Uniform Commercial Code, by authorizing a secured creditor to take possession of security without a judicial proceeding, is in conflict with the Due Process Clause of the Federal Constitution. He also argues violation of the Fourth Amendment and of Article I, paragraphs 1 and 7 of New Jersey's Constitution. He says that his car was, therefore, taken unlawfully by the bank's agents on November 17, 1971 and that he is entitled to damages  though only nominal  for the unlawful taking. Plaintiff initially named the State as a defendant, but later a consent judgment of dismissal was entered on application of the Attorney General.
It is quite common for secured creditors, after default, to repossess automobiles by the peaceful use of self-help. Rarely, however, have the questions presented here been litigated. Yet it now seems apparent that those questions are before long going to be placed before the United States Supreme Court. The federal court for the Southern District of California, in cases involving peaceful repossession of automobiles following default under installment purchase contracts, has held sections 9503 and 9504 of the California Commercial Code unconstitutional under the due process clause of the Fourteenth Amendment of the United States *6 Constitution. Adams v. Egley-Posadas v. Star and Crescent Fed. Credit Union (two cases), 338 F. Supp. 614 (S.D. Cal. 1972). The federal court for the Northern District of California on similar facts has reached the opposite result. Oller v. Bank of America, 342 F. Supp. 21 (N.D. Cal. 1972). In McCormick v. First National Bank of Miami, 322 F. Supp. 604 (S.D. Fla. 1971), the court ruled that plaintiff, whose automobile had been peacefully repossessed, had not suffered any infringement of constitutional rights.
Section 9503 in California is identical with N.J.S.A. 12A:9-503. Section 9504 is identical with N.J.S.A. 12A:9-504, which provides for disposition of the collateral after it has been repossessed.
Two main questions are presented: (a) Is there a sufficient element of state action involved to make the Fourteenth Amendment to the Federal Constitution applicable at all? And (b) If the Fourteenth Amendment does apply, has plaintiff been denied due process?
In Adams, supra, it was argued that no state action or action under color of state law could be shown; that the creditor had merely exercised a right of self-help given to him under the terms of a private contract. The court rejected this argument and held, in reliance upon Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), that sections 503 and 504 of Article 9 of the Code represented sufficient involvement by the State of California to bring within the scope of the Fourtenth Amendment repossessions of the cars in question. In Reitman the United States Supreme Court was concerned, not with procedural due process, but with racial prejudice and the rental of apartments. California had adopted legislation prohibiting discrimination in the sale or rental of some types of real estate. Then in 1964 the voters adopted an amendment to the state constitution providing that the state, its subdivisions and its agencies, should not deny, limit or abridge, directly or indirectly, the right of any person to sell or rent, or decline to sell or rent, to such person or persons as he in *7 his absolute discretion might choose. The effect of the constitutional amendment was to repeal the anti-discrimination statutes. The California Supreme Court held that the amendment to the state's constitution was invalid under the Fourteenth Amendment (64 Cal.2d 529, 50 Cal. Rptr. 881, 413 P.2d 825 and 64 Cal.2d 877, 50 Cal. Rptr. 903, 413 P.2d 847), and the United States Supreme Court by a vote of 4 to 5 reached the same result.
In Oller, supra, the court disagreed with Judge Nielsen's holding in Adams that sections 9503 and 9504 of the Uniform Commercial Code represented sufficient involvement by the State of California to bring peaceful repossession of an automobile by self-help within the scope of the Fourteenth Amendment. To support the holding that taking possession of the automobile did not constitute an action under color of state law within the meaning of the Fourteenth Amendment, Oller reasoned that Judge Nielsen's reliance upon Reitman, a case of racial discrimination in housing, was misplaced.
McCormick, supra, was decided a year before Adams and Oller and one of the grounds there for holding in favor of the secured creditor and against the car buyer was that section 9-503 of the Uniform Commercial Code was not so involved in a repossession, which had been contracted for by the parties, as to bring the Fourteenth Amendment into the case.
Section 9-503 of the Code limits a creditor's use of self-help to peaceful situations, but does it create or substantially contribute to the creation of the right of self-help? I think not. It appears to me that section 503 in its first sentence says that the secured party has the right to take possession on default even though the agreement is silent on the subject, but says in effect that where the parties have agreed about possession after default their agreement is to control. The agreement here is the creative thing and the first three words of section 503 ("Unless otherwise agreed") *8 merely make it clear that the statute does not bar the parties from making contracts as they see fit about possession after default.
Although it can be argued to the contrary that the enactment of section 9-503 either created the right to repossession under which defendant Trust Company acted, or so influenced the draftsman of the contract form signed by plaintiff that the repossession provisions would not have been inserted if section 9-503 had never been put on the statute books, my conclusion is that the existence of the section did not make the taking of the automobile on November 17, 1971 an action under color of state law, within the meaning of the Fourteenth Amendment to the Federal Constitution. It might be difficult to sustain this conclusion if self-help never had been legally recognized prior to the adoption of the Uniform Commercial Code. However, self-help has been known to the common law for centuries. 2 Pollack & Maitland, The History of English Law (2d ed. 1968), 574; 2 Blackstone, Commentaries on the Laws of England (with analysis by T. Cooley, 4th ed., 1899), 856-858. Even the use of force is permissible in some situations when chattels are being recaptured by self-help. 1 Restatement, Torts 2d, § 100-111 (1965). The long-established right of a mortgagee of real estate to take possession after default also may be mentioned. 19 N.J. Digest, Mortgages, § 191.
The District Court judgment of Adams, supra, is on appeal to the Court of Appeals for the Ninth Circuit, and I have been furnished with some of the material filed in support of the appeal. Among other things, I have been given a copy of the brief amicus curiae filed by Professor Mentschikoff on behalf of the permanent editorial board for the Uniform Commercial Code. Near the end of that brief it is said:
Section 9-503 simply recognizes this common knowledge of buyers on time that repossession follows default and makes unnecessary *9 its statement in the contract. It cannot be that codifying a generally understood practice of ancient and honorable lineage and surrounding it with safeguards renders the practice unconstitutional.
I think this comment sound and although at this stage of the opinion I am considering only whether the Fourteenth Amendment is applicable at all, I adapt the words to this context by saying that codification of the practice of self-help recaption by the enactment of section 9-503 cannot so give that practice the color of state law as to take it out of the private area and make it subject to the Fourteenth Amendment.
If I am mistaken in concluding that the Fourteenth Amendment does not apply to this case, then plaintiff's contention that he was denied due process is to be considered. The record here contains much information about the business of financing automobile purchases as that business is carried on by a number of representative lenders. In addition to calling officers of defendant Trust Company as witnesses, defendants' attorney presented testimony through Thomas McLaren, regional manager of the General Motors Acceptance Corporation; Roger O. Schembs, national manager of the Operations Analysis Office of Ford Motor Credit Company; Donald N. Craven, vice-president for the eastern United States, of Chrysler Credit Corporation; Roger W. Shaver, vice-president in charge of installment loans for the First Trust and Deposit Company of Syracuse, New York; Robert Allen, vice-president in charge of installment loans for First Jersey National Bank; Cyril F. Gill, an officer of Monmouth County National Bank, and Paul J. Meitzelfeld, vice-president in charge of installment loans for the First National Bank of Toledo, Ohio. The General Motors, Ford and Chrysler companies acquire sales contracts from automobile dealers. The banks, in general, make both direct loans to car buyers and, as in the present case, get contracts by assignment from automobile dealers. The witnesses described the practices of their respective employers in *10 handling collections and repossessions. There is a substantial degree of uniformity. Once a loan has been made or contract acquired, the necessary data about it is made part of a computer system. The computer is then relied upon to get out bills in advance of due dates and get out a late notice a few days after a failure to pay on time. If the debtor does not respond to a computerized notice that his account is delinquent, then the usual practice is to try to reach him by telephone. Much effort is made to keep accounts alive by adjusting the payment schedule and otherwise. Repossession is treated as a last resort, and when the decision is made to repossess it is usual practice to mail to the debtor notice of intent to repossess before a professional agency is directed to try to pick up the car.
Schembs of Ford Motor Credit Company gave rather comprehensive statistics. Through 146 branches (three of them in New Jersey) his company had 977,000 accounts nationally and 21,400 in this State. The total money value of the New Jersey accounts ran to $40,300,000. In New Jersey for the past year the company had 562 repossessions, but 97 of the cars were ultimately redeemed, making the net figure 465. In the whole country for the same period the total of repossessions by the Ford company was 38,142. In New Jersey Ford's ratio of repossessions to total open accounts for the year was 2.6% and approximately 4% on a nationwide basis.
Although the testimony of the witnesses shows that the fairly select group of lenders represented by them have a relatively low ratio of recaption cases to all loans, the number of cars repossessed in a year is large. The New Jersey Division of Motor Vehicles has certified that 14,192 notices of seizure were filed with it for the year 1970, and 13,489 for the year 1971. Appended to the brief of Professor Mentschikoff, already referred to, is an article by Robert W. Johnson, Professor of Industrial Administration at Purdue University, entitled "Denial of Self-Help Repossessions: An Economic Analysis." Professor Johnson says that at the *11 end of the first quarter of 1972 there was $38.8 billion of consumer installment credit outstanding in the United States that had been used to finance the purchase of automobiles, citing 58 Fed. Res. Bul. A-56 (June 1972). He goes on to examine in some detail available statistics from California, the state in which the transactions before the court in Adams, supra, took place. He says that eight banks and finance companies reported 49,600 automobile repossessions in California during 1971. At page 35 of his article he writes:
Although this figure does not represent all of the repossessions, it represents a substantial portion, since the major banks and finance companies make up the sample. Missing from the sample are repossessions by credit unions, personal property brokers, and automobile dealers * * * Repossessions by smaller banks and the few independent finance companies in California are also omitted.
Under practices which have prevailed up to now some automobiles have had to be retaken by replevin. However, all of the evidence before me and the material found in the Johnson article show that the percentage of replevin cases has been so small as to be an unimportant factor in reckoning the cost of changing over to a legally acceptable replevin system in all cases.
When considering costs, repossessions which the witnesses call "voluntary" may be of some importance. This term is used to indicate a situation in which the car buyer who is in default delivers the car to the bank or finance company or turns over his keys. For example, Shaver of the First Trust and Deposit Company of Syracuse testified to over 11,000 outstanding car loans in 1971 and to a total of 235 repossessions, of which 120 were "voluntary." It can be argued plausibly that if a hearing on notice should be made a requirement in each case, then delinquent car buyers will wait for the proceeding to be started and will not surrender the car voluntarily at some earlier stage; but no one can be sure about that.
*12 The witnesses before me were firm in their opinions that changes in recaption procedure to meet the requirements of Adams, supra, would impose substantial additional costs of doing business. It was testified that under present practices the bank or finance company sustains losses in a large percentage of repossession cases. This indicates a limited possibility of passing along to a particular defaulting car buyer the direct costs of repossessing his automobile by a legal proceeding, and further indicates that much of the burden of doing business in the new way ultimately would be borne by all who buy cars on credit. Witnesses also expressed the view that the only practical way to minimize the costs of conforming with the Adams case would be to select credit risks with greater care, thus keeping down the number of replevin cases. Professor Johnson also points out other elements of cost which would bear on the situation: the cost to the public of a substantial volume of additional court cases, a longer time to get possession of a car after a contract goes into default, great car depreciation, and so on.
Among thousands of recaptions a year one can imagine there are some in which car buyers get harsh treatment, but there is nothing before me to prove unfair tactics are in any degree usual. As for plaintiff, it has already been noted that a number of earlier defaults were tolerated before it was decided to take his car; and, although at the time of the taking he was out of work and depending largely upon unemployment compensation, he promptly obtained legal representation through the Union County Legal Services Corp. and with that help, in addition to bringing this action, was able to negotiate an arrangement for the prompt return of the automobile to him.
The finding in Adams, supra, of a lack of due process is based upon the conception that Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), controls and the principles there applied by the Supreme Court, while holding a garnishment statute of *13 Wisconsin unconstitutional because it failed to provide for notice and a hearing as a prerequisite for withholding wages, are similarly applicable to the retaking of an automobile by a secured creditor after default. Among the comments about Sniadach in the Adams opinion are these:
Some courts have interpreted the decision narrowly, and have confined it to its own facts. See Brunswick Corporation v. J & P, Inc., 424 F.2d 100 (10th Cir.1970); Termplan, Inc. v. Superior Court, 105 Ariz. 270, 463 P.2d 68 (1969); Michael's Jewelers v. Handy, 6 Conn. Cir. 103, 266 A.2d 904 (1970); Mills v. Bartlett, 265 A.2d 39 (Del. Super. 1970).
However, the great weight of authority, both state and federal, has taken a broader approach, seeing in Sniadach not a special constitutional rule for wages, but a return of "the entire domain of prejudgment remedies to the long-standing procedural due process principle which dictates that except in extraordinary circumstances, an individual may not be deprived of his life, liberty, or property without notice and hearing." Randone v. Appellate Dept., 5 Cal.3d 536, 547, 96 Cal. Rptr. 709, 715, 488 P.2d 13, 19 (1971). [338 F. Supp. at 618]
Since Adams the United States Supreme Court has decided Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed. 2d 556 (1972), holding unconstitutional on due process grounds replevin statutes of Florida and Pennsylvania under which writs against household goods had been issued without prior notice of any proceeding and without an opportunity for the possessors of the goods to have a hearing before seizure. Since Adams the Supreme Court also has decided D.H. Overmeyer Co., Inc. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), and there refused to hold invalid on constitutional grounds judgment on a cognovit note that had been obtained in Ohio by Frick against Overmyer without first giving notice and an opportunity to be heard. Taken together, Fuentes and Overmyer demonstrate that there is some flexibility in fashioning due process requirements to fit different situations. The cognovit note given to the Frick Company had been bargained for by businessmen and their attorneys. At the close *14 of his opinion for the majority in Overmyer, Justice Blackmun wrote:
Some concluding comments are in order:
1. Our holding necessarily means that a cognovit clause is not, per se, violative of Fourteenth Amendment due process. Overmyer could prevail here only if the clause were constitutionally invalid. The facts of this case, as we observed above, are important, and those facts amply demonstrate that a cognovit provision may well serve a proper and useful purpose in the commercial world and at the same time not be vulnerable to constitutional attack.
2. Our holding, of course, is not controlling precedent for other facts of other cases. For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue. [405 U.S., at 187, 92 S.Ct., at 783, 31 L.Ed.2d, at 135]
Both Overmyer and Fuentes dealt directly with the constitutional sufficiency of judicial proceedings in state courts; neither was a case of self-help. When the courts of a state are being used to enforce claims I think there is more reason for critical examination of what the state requires and more reason for demanding prior notice and hearing than there is in a case in which a creditor, without any assistance from the state's courts or the state's officers, seeks to enforce his rights to take possession of the security peaceably. Whether that view has merit or does not, I think paragraph 1 of the above quotation from Justice Blackmun's opinion bears forcefully upon the type of case of which this one is an example.
It must be conceded, however, that if plaintiff's car had been taken by replevin in November 1971, probably there would have been a violation of due process under Fuentes, supra. Prior to Fuentes New Jersey's replevin practice was like that of Florida and Pennsylvania in its failure to require a hearing and notice before issuing a writ. This concession leads to the following question: If it is unconstitutional to take by replevin, without prior notice and hearing, household goods which are subject to section 9-503 of *15 the Code from a buyer whose payments are delinquent, on what grounds, if any, can a different result be reached if an automobile is the subject of the taking and peaceful self-help is the method? Differences between house furnishings and car are not significant; Justice Stewart's opinion for the majority of four in Fuentes has clearly said no distinction is to be drawn because a citizen has been deprived of one type of property rather than another. (407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d, at 574-575). Keeping in mind that this portion of my opinion assumes that section 9-503 represents sufficient state action to bring the Fourteenth Amendment into play, then what significant differences are there between the replevin case and the self-help case? There are several.
The contract Mrs. Fuentes had signed  a contract of adhesion  provided that upon default the seller of the goods might at its option "take back the merchandise"; and the contract signed by the Pennsylvania appellants in Fuentes provided that the seller "may retake" or "repossess" the merchandise in the event of default. Nothing was said in either contract about waiving notice of a hearing, and it appears that the documents did not contain any reference to a replevin action (407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d, at 578-579). The contract signed by Mr. and Mrs. Messenger, although it, too, was one of adhesion, provided that upon default the contract holder might "with or without legal process and with or without previous notice or demand" take possession of the car together with anything in it. Thus, the limitations on a contract of waiver which the court pointed to in Fuentes are not present here. Although Justice Stewart noted (407 U.S. at 95, 92 S.Ct. at 2002, 32 L.Ed.2d, at 578) that the appellees in Fuentes had made no showing that the appellants "were actually aware or made aware of the significance of the fine print * * * relied upon as a waiver of constitutional rights," I do not read his opinion as a determination that contract language spelling out  as does the wording before me  *16 the right to retake without previous notice must be held invalid because any retaking in conformity with the contract wording would be violative of Fourteenth Amendment due process, in the absence of proof that the debtor who signed was actually aware of the provisions relating to retaking.
It may be that Mrs. Fuentes did no realize her failure to pay would bring an officer to her door armed with a writ of replevin which had been issued without any notice to her, but the position of one who buys a car on credit is significantly different. Thousands of cars are repossessed each year. It is difficult to believe the buying public is not well informed of the likelihood of repossession by the bank or finance company if installments are not paid. Plaintiff does not say that he lacked knowledge of such likelihood or that he was unaware of the express terms of his contract; the argument for him is that with or without knowledge of the consequences of default, he and those similarly situated are entitled by the Constitution to a hearing on notice before reception. I think that argument must be rejected. A car buyer, having a wealth of experience all around him to draw upon and make him aware of the possibility of repossession, is not in a situation where he can properly claim that reception of his car is a violation of his right to due process because, and only because, no prior hearing on notice to him took place.
Finally, the dissenting opinion of Justice White in Fuentes, an opinion in which the Chief Justice and Justice Blackmun concurred, contains comments which can be applied soundly to the present case:
Third: The Court's rhetoric is seductive, but in end analysis, the result it reaches will have little impact and represents no more than ideological tinkering with state law. It would appear that creditors could withstand attack under today's opinion simply by making clear in the controlling credit instruments that they may retake possession without a hearing, or, for that matter, without resort to judicial process at all. Alternatively, they need only give a few days' notice of a hearing, take possession if hearing is waived or if there *17 is default; and if hearing is necessary merely establish probable cause for asserting that default has occurred. It is very doubtful in my mind that such a hearing would in fact result in protections for the debtor substantially different from those the present laws provide. On the contrary, the availability of credit may well be diminished or, in any event, the expense of securing it increased.
None of this seems worth the candle to me. The procedure which the Court strikes down is not some barbaric hangover from bygone days. The respective rights of the parties in secured transactions have undergone the most intensive analysis in recent years. The Uniform Commercial Code, which now so pervasively governs the subject matter with which it deals, provides in Art 9, § 9-503, that:
"Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of peace or may proceed by action * * *."
Recent studies have suggested no changes in Art 9 in this respect. See Permanent Editorial Board for the Uniform Commercial Code, Review Committee for Article 9 of the Uniform Commercial Code, Final Report, § 9-503 (April 25, 1971). I am content to rest on the judgment of those who have wrestled with these problems so long and often and upon the judgment of the legislatures that have considered and so recently adopted provisions that contemplate precisely what has happened in these cases.
My conclusion is that if the Fourteenth Amendment has any application at all to this case, there has been no violation of the due process clause. As mentioned earlier, plaintiff also argues on the basis of various other constitutional grounds, both federal and state. It is my view that the only real question in this case is one of due process and that the references to other constitutional provisions have no merit.
Judgment will be entered for defendants against plaintiff.