138 N.J. Super. 404 (1975)
351 A.2d 356
IN THE MATTER OF AN IN-PROGRESS TRACE OF A WIRE COMMUNICATION TO BE MADE TO AND INTERCEPTED OVER TELEPHONE FACILITY NUMBER, ETC.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1975.
Decided December 26, 1975.
*405 Before Judges ALLCORN, KOLE and GAULKIN.
Mr. R. Benjamin Cohen, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Mr. Joseph P. Lordi, Prosecutor of Essex County, attorney; Mr. John A. Matthews, III, Assistant Prosecutor, of counsel).
Mr. Thomas E. Walsh, Jr. argued the cause for respondent New Jersey Bell Telephone Company (Mr. Bernard M. Hartnett, Jr., attorney).
The opinion of the court was delivered by E. GAULKIN, J.A.D. (retired), Temporarily Assigned.
*406 The question before us is whether the New Jersey Bell Telephone Company (company) may be ordered by the court to make, at the expense of the State, an "in-progress trace" in aid of a telephone wiretap which is being conducted under a warrant issued pursuant to N.J.S.A. 2A:156A-1 et seq. (hereinafter, the wiretap law).
Application for such an order was denied by a judge of the Superior Court. We granted the State's application for leave to appeal and heard the argument of the appeal forthwith.
In form, the application complied with all of the requirements of the wiretap law. It was supported by an affidavit of a detective which set forth that a wiretap order had been issued under the wiretap law and interception thereunder was taking place; the conversations intercepted revealed that the tapped telephone was being used for accepting illegal lottery and bookmaking bets; every day at approximately 4 P.M. a female telephones the tapped number and "in each of these phone calls, the female making the incoming call receives a series of lottery bets from the individuals sitting at * * *" the tapped phone; in the detective's expert opinion, the tapped telephone is being used by "a `sitter' * * * a person who sits by a telephone and accepts bets * * *. [T]he female who calls * * * every afternoon at approximately 4:00 P.M. is higher up in the syndicated gambling operation * * *. She * * * calls a number of sitters to get the bets they have accepted * * *"; the State is unable to identify the female caller without an in-progress trace; such a trace would enable it to identify the female "higherup" and possibly the bankers and controllers of the operation and their locations, which otherwise the State would not be able to determine. The company admits that "Only a trace can accomplish this and only the Company * * * can accomplish a trace * * * using equipment and techniques wholly under its control which the enforcement people have *407 no access to, and have no expertise in using, even if they had access."
An in-progress trace (hereafter trace) is the determination of the origin of a call coming in from an unknown to a known telephone. Such tracing is described in State v. Hibbs, 123 N.J. Super. 152, 154-159 (Cty. Ct. 1972), aff'd 123 N.J. Super. 124 (App. Div. 1973). The company's brief concedes that "it is not illegal for it to conduct a trace and * * * the trace, if successful, would enable the prosecutor to penetrate to a higher level * * * the organization whose activities he is pursuing and which in the light of the evidence already gathered is clearly engaged in a continuous and illegal operation * * *." It freely admits that in the past it has made many traces without court order, usually but not solely in cases involving obscene or annoying calls, threats and kidnapping. However, it contends that (1) in the absence of a statute, it may not be compelled to make a trace, and (2) assuming that a statute could constitutionally compel performance, no such statute exists.
We disagree. To begin with, even without express statutory authority, we think the company can be compelled to make a trace, by grand jury subpoena or by court order similar to a search warrant. See In re Addonizio, 53 N.J. 107 (1968); Schlossberg v. Jersey City Sewerage Auth., 15 N.J. 360 (1954); Merchandise Warehouse Co. v. Bowers, 15 Ohio op.2d 116, 173 N.E.2d 728 (Cty. Ct. 1960), app. dism. 171 Ohio St. 500, 172 N.E.2d 310 (Sup. Ct. 1961); cf. 58 Am. Jur., Witnesses, § 29 at 39:
Where the source of desired information is exclusively or peculiarly within the control of the witness, the court, acting within reasonable bounds and in the exercise of a sound discretion, may require the witness to acquaint himself with the information and to communicate it to the court.
For example, in United States v. Friedman, 388 F. Supp. 963 (W.D. Pa. 1975), the court ordered a bank to search *408 the records of all of its 102 branch offices, provided the government paid the expense. In Oklahoma Press Publ. Co. v. Walling, 327 U.S. 186, 209, 66 S.Ct. 494, 506, 90 L.Ed. 614, 630 (1946), the court said,
The requirement of `probable cause, supported by oath or affirmation' literally applicable in the case of a warrant is satisfied, in * * * an order for production, by the court's determination that * * * the documents sought [by subpoena] are relevant to the inquiry.
Moreover, says the State, our wiretap law does authorize the court to compel a trace in aid of a legal wiretap, and for that purpose application may be made (as it was here) in accordance with our wiretap statute, especially N.J.S.A. 2A:156A-12, as amended by L. 1975, c 131 (approved and effective June 30, 1975). The amendment of § 12 provides:
An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier shall furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier is affording the person whose communications are to be intercepted. Any communication common carrier furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates. Said carrier shall be immune from civil liability for any assistance rendered to the applicant pursuant to this section.
The State argues that this amendment gives the court the power to order the company to make a trace in aid of a wiretap. The company denies this. To begin with, it says that in the process of adopting this amendment the Legislature showed its intention that the courts should not have the authority to order an in-progress trace. It points out that when the bill (S-1417) which ultimately became L. 1975, c. 131 was first introduced, it proposed that the amendment to § 12 read as follows:
*409 An order authorizing the interception of a wire or oral communication shall, upon a showing of special need by the applicant, direct that a communication common carrier use its best efforts to furnish forthwith the applicant with all information, facilities and technical assistance necessary to accomplish an in-progress trace or interception. * * *
When the bill was finally passed the last-quoted language was changed to that of the current amendment of § 12 quoted above. Among the words stricken from the bill was the reference to "an in-progress trace." The company argues that since the "specific language authorizing such an in-progress trace was deleted" it proves that the Legislature intended that no such authority be permitted. The company claims that the change was made because its representatives testified in opposition to this grant of authority.
Our study of the background of the amendment to § 12 satisfies us that the Legislature's change of the original bill was no expression of intent against the ordering of traces. Our wiretap statute is a close copy of the federal wiretap statute (18 U.S.C.A. § 2510 et seq.). In May 1970, in Application of the United States for Relief, 427 F.2d 639 (9 Cir.1970), the court held that a federal court had no authority to order a telephone company to furnish services and assistance required by the F.B.I. to carry out an authorized wiretap. Almost immediately (on July 29, 1970) Congress adopted P.L. 91-358, Title II, § 211(b), July 29, 1970, 84 Stat. 654 (18 U.S.C.A. § 2518(4)), which provided:
An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates.
*410 In September 1974 New Jersey's Attorney General, William F. Hyland, proposed a revision of many sections of our wiretap law. In his report to the Governor and the Legislature he called attention to the case of Application of the United States for Relief, supra, the resulting federal legislation, and the fact that the New Jersey wiretap act "reveals no provision which compels the telephone company to render technical assistance to law enforcement officials, even under the most compelling circumstances." Report on the New Jersey Wiretapping and Electronic Surveillance Control Act, 26 (1974). Therefore, he recommended legislation "modeled after the federal Act" but not as broad, because "the requirements of the State's prosecutors are less broad." Id. at 27. Consequently, he proposed that the obligation of the company to provide assistance be limited to in-progress traces. He said, in the report:
* * * The single most important service that can be furnished to law enforcement by the telephone company is that of an in-progress trace. With the equipment available to law enforcement officials, it is impossible to determine the telephone facilities from which an incoming call has been placed. Through an in-progress trace, however, the telephone company is able to ascertain this information. No other technical assistance is considered indispensable. * * * [Id. at 26; emphasis added]
The report pointed out that "The New Jersey Bell Telephone Company has been reluctant to provide the technical assistance requested by the State's prosecutors. This policy is based upon the company's concern for the privacy of its subscribers, combined with its conclusion that it is not legally required to assist law enforcement in the area of electronic surveillance." Id.
The report proposed other departures from the federal act which would have placed greater restrictions and limitations upon the State than did the federal act. To carry out his proposals the Attorney General proposed the language which was contained in the first draft of S-1417. Of this language the Attorney General said: "The suggested amendment, *411 more restrictive than that contained in the federal code, is an attempt to accommodate the policy of the telephone company with the requirements of law enforcement officials."
From this it appears that the Attorney General construed the 1970 amendment to the federal wiretap act as requiring the company to provide assistance for traces and more, and he wished to eliminate the "more" because Company assistance was indispensable only for traces. Cf. Application of the United States for Relief, supra at 409. Obviously, the Legislature decided to reject the recommendations of the report and opted for the more permissive language of the amendment to the federal act. It changed the language of S-1417 to make the law as it is, almost identical with the federal statute. That this plainly was the intent of the Legislature is obvious from the Committee's Statement which accompanied the final draft of the bill. It said:
The committee amended the bill's provision which added a specific requirement that as part of an order a communication common carrier could be required to furnish technical assistance in order to conform this provision to the federal law. [Emphasis added]
From the foregoing we conclude that there is no reason to construe § 12 of our statute differently than the corresponding section of the federal act.
The company replies that the federal act does not authorize compulsory traces; since the statutes are the same and the state statute depends upon the federal act for its validity (18 U.S.C.A. §§ 2510-2520), the state act does not authorize traces either.
The company cites no federal or state case which has dealt with whether a trace may be compelled, and we know of none. Its argument may be summarized as follows: Neither the state nor the federal wiretap statute applies to traces; they apply only to oral interceptions of communications; a trace does not intercept (i.e., overhear) a communication; therefore, an order under the wiretap statutes *412 is not required for a trace; ergo, an order for a trace may not be obtained under either statute.
In support of its claim that both statutes govern only interceptions, meaning "the aural acquisition of the contents" of communications, the company points out that Senate Report No. 1097 (2 U.S. Code Congressional and Administrative News, 90th Congress, 2d Sess. p. 2112 (1968)) which preceded the adoption of the federal act said:
* * * Other forms of surveillance are not within the proposed legislation. See Lee v. United States, 47 S.Ct. 746, 274 U.S. 559 [71 L.Ed. 1202] (1927); Corngold v. United States, 367 F. 2d 1 (9th 1966). An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an "interception." (United States v. Russo, 250 F. Supp. 55 (E.D. Pa. 1966)). The proposed legislation is not designed to prevent the tracing of phone calls. The use of a "pen register," for example, would be permissible. But see United States v. Dote, 371 F.2d 176 (7th 1966). The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication. S. Rep. No. 1097 at 90, U.S. Code Cong. & Admin. News 1968, p. 2178.
As we have said, a trace locates an unknown telephone from which a known one is being called, and records the fact that the call is being made but does not overhear it. A "pen register" records the numbers called from a known telephone, but may readily be converted to an intercepting device by the addition of headphones. See In re Joyce, 506 F.2d 373 (5 Cir.1973); United States v. Focarile, 340 F. Supp. 1033 (D. Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4 Cir.1972), aff'd 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). See generally, "The Pen Register," 20 Drake L. Rev. 108 (1970).
The State admits, and we agree, that neither a pen register alone (without the accessory earphones) nor a trace alone intercepts a communication within the meaning of the acts. United States v. Clegg, 509 F.2d 605, 610, n. 6 (5 Cir.1975). Indeed, they merely record the numbers dialed from the registered or traced telephone  they do *413 not even show that the calls have been completed, i.e., have been answered. Therefore, it may be true that the acts need not be followed to obtain an order for a trace alone or a pen register alone. However, it does not necessarily follow that such an order may not be obtained for a trace or a pen register in a proper case  for example, when it is in aid of a wiretap or when the facts of a given situation indicate to the police that a defendant might reasonably argue that the wiretap act should have been followed. Cf. State v. Murphy, 137 N.J. Super. 404 (Law Div. 1975).
Even if an application for a particular pen register (or trace) need not be made under the wiretap act, or comply with it, such an application still may have to respect the Fourth Amendment. See Giordano, supra 416 U.S. at 553-554, 94 S.Ct. at 1845, 40 L.Ed.2d at 374-375 (Powell, J., concurring in part and dissenting in part); United States v. Brick, 502 F.2d 219, 223 (8 Cir.1974); Cranwell, "Judicial Fine-Tuning of Electronic Surveillance," 6 Seton Hall L. Rev. 225, 247 (1975).
The wiretap acts serve two basic purposes. First, they provide for the showing of probable cause, etc., necessary for compliance with the Fourth Amendment. Above and beyond that, the acts place restrictions upon the use of wiretaps and the invasions of privacy that they entail. Therefore, if the State, for good reason, wishes to follow the procedures and accept the limitations of the wiretap act, even though it might be able to satisfy the Fourth Amendment otherwise, we see no reason why it should not be permitted to do so. Indeed, that procedure may be desirable.
The wiretap statute in effect prior to the adoption of 18 U.S.C.A. § 2510 et seq., was construed as forbidding pen registers without a wiretap order because it governed not only the interception of a conversation but forbade the revelation that there had been one. United States v. Dote, 371 F.2d 176 (7 Cir.1966). The language that led to that result was dropped in 18 U.S.C.A. § 2510 et seq., and, consequently, the opinion of the Congress was that a pen *414 register did not require an order which met the standards and adhered to the restrictions applicable to a wiretap. However, we see no reason to believe that Congress meant that application could not be made under the wiretap statute for a pen register if, for good reason, the government felt it best to do so. Note that as late as January 9, 1975, in In re Joyce, supra at 379, the court laid aside, as open questions which it did not then need to decide, "(1) whether a `pen register' order unaccompanied by a wiretap application is within or without Title III, * * *" and "(3) whether a federal court has the authority to order a wire carrier or its employees to participate with law enforcement officials in the installation of a `pen register' pursuant to the court's power to issue search warrants * * *" under the federal criminal rules, without complying with the wiretap act. In view of this uncertainty of opinion at the federal level, the State is merely acting cautiously to protect the fruits of its efforts from constitutional challenge.
Finally, we think that the company interprets the word "intercept" too narrowly. N.J.S.A. 2A:156A-2 says (as does the federal statute):
"Intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device * * *. `Contents' * * * includes any information concerning the identity of the parties to such communication or the existence, substance, purport or meaning of that communication * * *. [Emphasis added]
We hold that, because of the wiretap, the trace here demanded was for "information concerning the identity" of the caller, and that is an additional reason why the demand was properly made under the wiretap act. (We need not now decide whether it had to be so made.) When a trace alone is made, nothing is revealed except numbers dialed and the location of the traced telephone. The identities of the speakers are not directly revealed, for anyone, not necessarily the customer, might use the traced telephone. However, *415 when a trace is combined with a tap the purpose of doing so is to establish the identity of the speakers, as well as the location of the traced telephone. When a trace is coupled with a tap the identity of the speakers may be more readily determined or evidence obtained which would lead to identification; for example, through saluations, the voices, internal clues from the conversation, etc. See United States v. Clegg, 509 F.2d 605 (5 Cir.1975); 20 Drake L. Rev. 108 (1970).
In United States v. Clegg, supra, an employee of the telephone company used an instrument called a TTS 176, a type of pen register, to determine whether a subscriber had attached a "blue box" to his telephone so that he could make calls without the knowledge of the company. The TTS 176 indicated that the telephone was so rigged, so the employee listened to several conversations to determine who was using the rigged telephone. While doing so the employee heard the salutations of the speakers, from which he determined that it was Clegg. He reported what he heard to the F.B.I. Thereafter the salutations which he heard were used as evidence to convict Clegg of defrauding the company. On appeal Clegg argued that this evidence constituted an unlawful search. The contention was rejected only because the employee had listened without the authority or cooperation of the government, and he had the right to listen to protect the interests of the company. In footnote 8 at page 610 the court made this statement: "The salutations were, of course, part of the aural content of Clegg's conversations. Had government action been involved in recording them, there is no doubt that both the Fourth Amendment and Title III would have been violated." (Emphasis added).
When a telephone is tapped without the knowledge or consent of the subscriber whose phone is tapped, the wiretap act protects his rights. However, such taps involve those who speak with him. This is one of the unavoidable social costs of a legal wiretap. If the identity of the *416 caller is revealed in the conversations, that, too, is an unavoidable by-product. However, when the identity of a particular calling party is not known, not revealed and cannot otherwise be learned, and the State turns toward him to seek his identity by means of a trace, it seems to us that the State is seeking "information concerning the identity of the parties to the communication" within the meaning of N.J.S.A. 2A:156A-2; the calling party is now a suspect and therefore here it was reasonable for the prosecutor to conclude that he might be entitled to the same protection afforded by the wiretap act to the tapped customer. It is already known that the female who calls at four o'clock is engaged in criminal activity; the purpose of the trace is to enable the police to continue the tap and wait for another incriminating four o'clock conversation so that the female caller may be identified and she and others may be arrested. An application for an order for a trace for such a purpose, we think, may be made under § 12 of our wiretap act.
The fact that the application for a trace was made after the order for the tap had been entered is immaterial. The order sought here should have been granted.
The judgment of the trial court is reversed.