143 N.J. Super. 322 (1976)
362 A.2d 1304
STATE OF NEW JERSEY, PLAINTIFF,
v.
STUART DROUTMAN, DEFENDANT.
Superior Court of New Jersey, Law Division (Criminal).
Decided June 8, 1976.
*327 Mr. James E. Flynn for defendant (Mr. James P. Dugan, attorney).
Mr. Walter J. McNicholas, Assistant Prosecutor for the State (Mr. James T. O'Halloran, Prosecutor of Hudson County, attorney).
THURING, J.S.C.
Defendant, charged with disorderly conduct for making annoying and harassing telephone calls under N.J.S.A. 2A:170-29(4)[1], now moves to suppress evidence of his identity obtained as a result of an alleged illegal telephone trace. He contends that the trace was in violation of the Fourth Amendment of the United States Constitution and of N.J.S.A. 2A:156A-1 et seq., the New Jersey Wiretapping and Electronic Surveillance Control Act. Specifically, he complains that the State and the New Jersey Bell Telephone Company (company) illegally used tracing equipment to detect his telephone number without benefit of a search warrant or court order.
The description of the company's tracing equipment and method used to locate harassing callers is here omitted since State v. Hibbs, 123 N.J. Super. 152 (Cty. Ct. 1972), aff'd 123 N.J. Super. 124 (App. Div. 1973), comprehensively covers the subject.
The motion presents the issue of whether the use of a telephone company's tracing equipment to record the origin of telephone calls from defendant to a complainant-subscriber is a "search" within the meaning of the Fourth Amendment. The court however must first determine whether the degree of state involvement with the challenged conduct is sufficient to trigger constitutional consideration.

*328 WAS STATE ACTION HERE INVOLVED?

The Fourth Amendment's proscription against unreasonable searches and seizures functions to limit official powers and to deter governmental abuses. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The exclusionary rule of evidence, derived from the Fourth Amendment and made applicable to the states through the Due Process Clause of the Fourteenth Amendment, is designed to implement this policy. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The impact of Mapp, however, does not extend to searches conducted by private individuals. State v. Robinson, 86 N.J. Super. 308, 318 (Law Div. 1965); Geniviva v. Bingler, 206 F. Supp. 81, 83 (W.D. Pa. 1961). Accordingly, the Fourth and Fourteenth Amendments do not require the exclusion of evidence obtained through private action. Del Presto v. Del Presto, 97 N.J. Super. 446 (App. Div. 1967); Barnes v. United States, 373 F. 2d 517 (5th Cir.1967). Evidence gathered solely through nongovernmental effort can be reported or surrendered to the police without violating the defendant's constitutional right "regardless of the means by which the civilian discovered the evidence." State v. Frank, 112 N.J. Super. 592, 594 (App. Div. 1971).
It is equally clear, however, that joint participation between private citizens and police officers is sufficient to bring such conduct within the purview of the Constitution. United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); State v. Scrotsky, 39 N.J. 410 (1963); Stapleton v. Los Angeles Cty. Superior Court, 70 Cal.2d 97, 73 Cal. Rptr. 575, 477 P.2d 967 (Sup. Ct. 1969). The minimal degree of official involvement with private action needed to activate Fourth Amendment safeguards is set forth in United States v. Clegg, 509 F.2d 605 (5 Cir.1975). It was there held (at 609) that "only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure, which the *329 government itself, under the circumstances, could not have undertaken" does the problem of compliance with Fourth Amendment standards arise. (Emphasis supplied.) If the facts support this threshold level of tacit cooperation, state action would exist for purposes of this argument.
A stipulation by the parties that law enforcement officials neither participated nor intervened in any stage of the tracing operation effectively resolves this inquiry. It is clear that police and the prosecutor's office were not notified of the investigation's inception, nor was their approval or authorization ever sought. The use of the tracing equipment was exclusively within the expertise and control of the company, initiated by the complaint of the telephone subscriber. It was operated pursuant to the company's internal annoyance call program, in existence since 1965. State v. Hibbs, supra 123 N.J. Super. at 156.
Since nonparticipation by the State in the trace is conceded, defendant's state action argument rests solely on the legal implication of the State Board of Public Utility Commissioners' (PUC) regulatory authority over the company. Defendant argues that by virtue of the regulatory supervision actions of the company are attributable to the State.
The mere fact that a public utility is subject to greater regulation than other private corporations or private individuals does not necessarily imply state action whenever the utility acts. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). See also, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Lucas v. Wisconsin Electric Power Co., 322 F. Supp. 337 (E.D. Wis. 1970), aff'd 466 F.2d 638 (7 Cir.1972), cert. den. 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973); Doe v. Bridgeton Hospital Ass'n, 130 N.J. Super. 416, 431 (Law Div. 1974) certif. granted 69 N.J. 85 (1975). In testing the existence or nonexistence of state action the inquiry should not turn on the relationship between the private entity and the state in general but should focus on the relationship *330 between the state and the challenged conduct of the regulated entity. Jackson v. Metropolitan Edison Co., supra 419 U.S. at 351, 95 S.Ct. 449. The court must therefore determine whether the state has significantly involved itself in the alleged illegal tracing program of the telephone company. See Moose Lodge No. 107 v. Irvis, supra 407 U.S. at 173, 92 S.Ct. 1965.
Jackson presented a situation where an electric company discontinued service to a subscriber due to alleged arrearages. Such business practice was approved by the state public utilities commission. The Supreme Court held that even though the utility was subject to extensive regulation in many particulars and enjoyed a monopoly in its service territory state action did not exist. The court based its decision, in part, on the fact that no relationship existed between the company's action and its monopoly status or the nature of its regulation that would implicate the state in the activity. See also, Lucas v. Western Electric Power Co., supra.
Here the telephone company, like other public utilities, enjoys a monopoly protected and regulated by the State through the PUC. In this regard the Commission not only approves rates which the company charges its subscribers, N.J.S.A. 48:2-21, but is also empowered to issue regulations necessary for the supervision of the utility. N.J.S.A. 48:2-13. The broad regulatory scheme extends to practices of the company affecting the rendition of proper and adequate service to the public. N.J.S.A. 48:2-23 and 25. Arguably it may encompass the tracing operation employed by the company herein, particularly if the activity is to be considered part and parcel of the normal service due to subscribers. Although state action may emanate from rulings of administrative agencies, Moose Lodge No. 107 v. Irvis, supra at 179, 92 S.Ct. 1965, defendant cites no specific regulation of the PUC which has any significance on the issue presented.
*331 State action exists when a state agency "affirmatively orders or specifically approves the [challenged conduct] in the course of its regulatory rule making". Jackson v. Metropolitan Edison Co., 483 F.2d 754, 757 (3rd Cir.1973), aff'd 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). (Emphasis supplied.) Mere approval by the state agency, on the other hand, of a business practice will not suffice for state action purposes where the agency "has not put its own weight on the side of the proposed practice by ordering it." 419 U.S. at 357, 95 S.Ct. at 456.
In Public Utility Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), a street railway company, whose service and equipment were subject to regulation by the District of Columbia PUC, provided its passengers with radio service. It was argued that this practice was constitutionally impermissible. The Supreme Court discerned a sufficiently close relationship between the Federal Government and the radio service to necessitate a consideration of the First and Fifth Amendments. The Court's finding of governmental action was based principally on the fact that the PUC, after conducting formal public hearings, affirmatively approved the action alleged to be objectionable.
Here there is nothing in the record showing a company hearing before the PUC resulting in the issuance of any regulation or order approving the tracing activity.
On the contrary, it is clear that the tracing operation was undertaken on the initiative of the company alone, pursuant to its in-house annoyance call program, without any specific directive or authorization of the PUC.
The annoyance-call program is purely company policy and reflects motives and consideration unique to the company. Employing its own technical expertise and responding to what it viewed as an ever-increasing threat to the quality of its services, the company developed sophisticated tracing equipment capable of identifying the source of harassing and annoying calls. A trace is utilized to protect both the interests of the company and its subscribers and represents *332 in this instance an independent course of action by the company.
However detailed and broad state regulation of the company may be in some particulars, it is equally clear that the State does not manage telephone companies. Penn-Harris Hotel Co. v. Pennsylvania PUC, 166 Pa. Super. 394, 71 A.2d 853 (Super. Ct. 1950). As previously noted, the controlling factor must be state involvement in the very activity in question. Doe v. Bridgeton Hospital Ass'n, 130 N.J. Super. 416, 433 (Law Div. 1974). In this regard the court is unable to perceive any significant relationship between the favored status the company enjoys by virtue of state law or the nature of its regulation by the PUC and the tracing operation employed that would warrant a finding of state action.
Independent research reveals yet another premise upon which state action may rest. When private conduct is sufficiently fostered or encouraged by the State, such conduct will be imputed to the State under the Fourteenth Amendment. Doe v. Bridgeton Hospital Ass'n, supra at 431. This situation exists when a statutory scheme or executive directive compels, or at least provides the impetus for the alleged proscribed activity. Id.; Jackson v. Metropolitan Edison Co., supra, 483 F.2d at 757.
In Doe certain private hospitals prohibited their facilities from being used for the performance of first trimester nontheropeutic abortions. The Attorney General of New Jersey, after the landmark abortion decisions in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 755, 35 L.Ed.2d 147 (1973), announced that no hospital or clinic would be compelled to permit abortions on its premises. Female plaintiffs instituted an action based on the alleged deprivation of their constitutional rights, contending that the announcement of the Attorney General constituted state action. The court disagreed, citing the neutral position of the State on the issue and relying on the *333 fact that the "Attorney General's statement did not encourage or give authority which the hospitals otherwise did not have." 130 N.J. Super. at 435.
For present purposes the court notes a provision in New Jersey's wiretap statute which allows the interception of a communication obtained by a telephone company "while engaged in any activity which is a necessary incident to the rendition of [its] service." N.J.S.A. 2A:156A-4(a). Does the existence of such provision implicate the State in the tracing operation of the company sufficient to constitute state action? The court believes not.
Initially the court observes that a trace is not an interception of a communication within the meaning of the wiretap statute. (See infra) Although the company here could arguably have invoked the protection of N.J.S.A. 2A:156-4(a), which sanctions a far more intrusive type of activity than the trace, there is no evidence of such reliance.
More significant is the fact that the cited provision merely recognizes the right of the telephone company to engage in activity necessary for the protection of its property and the rendition of quality service, if it so desires. Although it authorizes interception under carefully defined circumstances, it does not mandate this result. The State by adopting the provision has in no way put its weight behind the tracing operation by ordering it. Neither has the State provided the impetus to the company to engage in such activity. The initiative for the action taken came from the company, rather than the State, as evidenced by the fact that the company's use of tracing equipment preceded the adoption of the wiretap statute. As previously noted, the company's annoyance-call program had been in existence since 1965. The mere enactment into statutory form of what had been accepted private practice for years does not result in state action. Adams v. Southern Cal. First Nat'l Bank, 492 F.2d 324, 333 (9 Cir.1973), cert. *334 den. 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974).
In Adams a creditor and debtor entered into a security agreement which provided for prejudgment self-help repossession of secured property upon the debtor's default without notice and hearing. The creditor practice was explicitly authorized under a California statute. Cal. Com. Code §§ 9503, 9504. The court held that legislative adoption of the statute which confirmed that which had been the law of the state, did not amount to state action.
In an identical factual context, the court in King v. South Jersey Nat'l Bank, 66 N.J. 161 (1974), held that use of the self-help remedy by a secured creditor under New Jersey's Commercial Code was not an act under color of state law. The court reasoned that the challenged provision simply codified existing law, evidenced the State's neutral position, and was not to be construed as encouraging the use of the private remedy. See also, Messenger v. Sandy Motors Inc., 121 N.J. Super. 1 (Ch. Div. 1972).
The court reaches a similar result here, distinguishing the present set of facts from those situations where the State expressly authorizes that which had before been expressly prohibited. See Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). In the latter context the State involves itself to a significant degree in private action by lending the legitimating force of its law to otherwise illegal activity.
A different situation is here presented. Before the adoption of the New Jersey wiretap statute in 1968 it was unlawful "for any person to tap a telephone line belonging to any other person or to disclose any communication thus obtained." State v. Christy, 112 N.J. Super. 48, 53 (Law Div. 1970); N.J.S.A. 2A:146-1, repealed L. 1968, c. 409; N.J.S.A. 48:17-19. However, the voluntary tracing of calls by a telephone company in the normal course of its business activities was never expressly prohibited by law. Thus the passage of N.J.S.A. 2A:156A-4(a), as it *335 may pertain to the tracing operation herein, amounts to no more than a ratification of an existing business practice. It has been held that the failure of the State to legislatively overturn or alter a pre-existing course of private conduct cannot be equated with state action. 419 U.S. at 357, 95 S.Ct. 449; 66 N.J. at 175. At most the relevant statutory provision represents a neutral position by the State, neither commanding nor proscribing such activity. Under such circumstances, it cannot be said that the State has sufficiently involved itself in the activity of the company to engender state action.
Consequently, Fourth Amendment considerations do not apply to bar evidence derived from the company's use of tracing equipment. That being so, the issue of whether the trace constitutes a search is mooted and need not be reached by the court. The court now turns to defendant's only remaining contention.

DOES THE USE OF TELEPHONE TRACING EQUIPMENT VIOLATE THE NEW JERSEY WIRETAP STATUTE?
Defendant further contends that since the tracing activity of the company was initiated without judicial approval it was in violation of the wiretap statute. The court rejects such contention on the ground that the statute's authorization provisions contained in N.J.S.A. 2A:156A-8, 9, 10 and 12 could not and need not be followed in this instance.
Initially it is to be noted that an order to intercept could only issue upon the application of the Attorney General, a county prosecutor or chairman of the State Commission of Investigation, seeking authorization to intercept during the course of an official investigation of certain statutorily prescribed crimes. N.J.S.A. 2A:156A-8. Not only is the making of harassing calls not a crime delineated in § 8, but, as previously established, the use by the company of its tracing equipment is not an official investigation. In this *336 situation, judicial authorization to conduct such activity would have been entirely inappropriate.
The fact that no court order could have issued under the wiretap statute does not resolve the question of the company's legal right to trace. The answer to that question must be found in the court's determination of whether a trace is within the proscription of the wiretap statute.
The wiretap statute renders unlawful the interception of communications which are not in accord with procedures outlined in its provisions. N.J.S.A. 2A:156A-21. N.J.S.A. 2A:156A-2(c) defines the term "intercept" as the "aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." "Contents" include "any information concerning the identity of the parties to such a communication or the existence, substance or meaning of that communication." N.J.S.A. 2A:156A-2(g). A reading of the cited provisions clearly indicates that the statute applies to the use of any device or apparatus capable of detecting, among other things, the identity of a party to a communication as a result of overhearing words or sounds.
A trace records the fact that a call is being made and verifies the phone number from which a call is being placed. State v. Hibbs, supra 123 N.J. Super. at 159. The trace, however, does not overhear the call itself. United States v. Clegg, supra at 610, n. 6; In re In-Progress Trace Wire Communication, 138 N.J. Super. 404, 412 (App. Div. 1975), certif. granted 70 N.J. 144 (1976). Neither does it directly reveal the identity of the speakers, "for anyone, not necessarily the customer, might use the traced telephone." Id. 138 N.J. Super. at 414. Although subsequent investigation, apart from the trace, may indeed locate the particular calling party, the important consideration for the court is that the identification was not initially obtained as a result of any overhearing or interception. The recording by the telephone company of the fact of a call is not an interception. See United States v. Gallo, 123 F.2d 229, 231 (2nd Cir.1941).
*337 In the context of 18 U.S.C.A. § 2510 et seq. (the federal wiretap statute) it has been held that the use of a pen register, a device which records the numbers dialed from a known telephone, is not an interception of a wire or oral communication. United States v. Focarile, 340 F. Supp. 1033 (D. Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4 Cir.1972), aff'd 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).
With the exception of the decision in State v. Murphy, 137 N.J. Super. 404 (Law Div. 1975), motion for leave to appeal granted, Docket A-1359-75 (App. Div. Feb. 19, 1976), decided in the context of a touch tone decoder, a device similar in use to a pen register, our state courts have never directly decided whether an application by the State for an order for a trace must be made under the New Jersey wiretap statute. This issue was not directly before the court in In re In-Progress Trace Wire Communication, supra. The Appellate Division did state however:
The State admits, and we agree, that neither a pen register alone (without the accessory earphones) nor a trace alone intercepts a communication within the meaning of the acts. * * * Therefore it may be true that the acts need not be followed to obtain an order for trace alone or a pen register alone. [138 N.J. Super. at 412-413]
It is clear to the court that since employment of the tracing equipment did not involve an interception, it is not an instrument by which an aural acquisition takes place within the meaning of N.J.S.A. 2A:156A-2(c) and (d). This interpretation is reinforced by reference to the legislative history of 18 U.S.C.A. § 2510 et seq., the federal analogue of the New Jersey wiretap statute. The report of the Senate Committee on the Judiciary in delineating the scope of the statute explains that
* * * other forms of surveillance are not within the proposed legislation. * * * The proposed legislation is not designed to prevent the tracing of phone calls. The case of a pen register, for example, would be permissible. [S. Rep. No. 1097, 90th Cong., 2d Sess. at 90 (1968)]
*338 Defendant cites United States v. Dote, 371 F.2d 176 (7 Cir.1967); United States v. Caplan, 255 F. Supp. 805 (E.D. Mich. 1966); United States v. Guglielmo, 245 F. Supp. 534 (N.D. Ill. 1965), for a contrary holding, but the court notes that such cases preceded the adoption of the current federal wiretap statute and are, therefore, inapplicable.
Recognizing that the intendment of the legislation was to protect the privacy of communicative content, which is itself capable of being overheard, and not the very means of communication, the court finds that the provisions of N.J.S.A. 2A:156A-1 et seq. have no application to the installation of tracing equipment.
For the reasons stated, the motion to suppress is denied.
NOTES
[1] The municipal court hearing was completed with the decision reserved pending the outcome of the motion to suppress.